T.C. Memo. 1997-24

UNITED STATES TAX COURT

STEPHEN AND JANE MARRIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3040-95.                    Filed January 14, 1997.

Stephen Marrin, pro se.

<u>Mark A. Ericson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined the following
deficiencies in, and additions to, petitioners' Federal income
taxes:

|       |            | Addition to Tax |
| Year  | Deficiency | Sec. 6651(a)(1) |
| 1989  | $28,341    | $1,305          |
| 1990  | 31,777     | 8,009           |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  The issues for decision are as follows:  (1) Whether petitioners are entitled to claim their 1989 and 1990 losses from transactions in securities and futures contracts as ordinary losses.  We hold that they are not.  (2) Whether petitioners are liable for additions to tax for failure to file timely returns under section 6651(a)(1).  We hold that they are.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate by this reference the stipulation of facts and attached exhibits.  Petitioners resided in Baldwin, New York, at the time they filed their petition.  They filed joint Federal income tax returns for 1989 and 1990, the taxable years in issue.

Stephen Marrin (petitioner) had substantial experience in trading and underwriting securities, having been employed in this capacity by several securities firms starting in 1969, becoming a registered securities principal in 1978, and starting a securities firm, Egan Marrin and Rubano, Inc. (EMR), in 1983, where he also dealt in securities as a registered securities principal.  All firms at which petitioner worked were registered broker-dealers, and he undertook transactions on their behalf.

At times, petitioner also bought and sold securities for his own account.

Petitioner left EMR in 1987, largely for reasons of health. In October 1988 petitioner commenced employment as a registered securities principal with Cadre Consulting Services, Inc. (Cadre), a registered broker-dealer. Petitioner was a full-time employee of Cadre. In 1988, in addition to the securities transactions undertaken on behalf of his employer, petitioner bought and sold securities, as well as futures contracts, for his own account. During 1988, petitioner began to employ the "on the book" method of bid and asked when buying and selling securities for his own account.

Under the "on the book" bid and asked method, petitioner would place orders to buy securities (bids) and to sell securities (asks) with his broker at specified bid and asked prices. A maximum quantity to buy or sell would be specified, as well as an agreement to accept quantities that only partially filled an order. Petitioner would endeavor to set his bid and asked prices at levels slightly better than prevailing prices. Most significantly, the orders were required to be handled "on the book", which deprived those handling the order of any discretion to delay filling it in anticipation of improvements in the market. Moreover, if petitioner's bid or ask constituted the best price for a security, "on the book" treatment would result

in his price being displayed on the appropriate securities exchange.  Petitioner's goal in employing the "on the book" bid and asked method was to derive a profit from the "spread" prevailing between bid and asked prices on the market. Petitioner also purchased and sold futures contracts during 1988.

Petitioners reported all of their transactions in securities and futures contracts on Schedule D of their 1988 Federal income tax return as capital gains and losses, claiming a net capital loss of $87,377 from such transactions.

In 1989, petitioner continued to serve as a registered securities principal for Cadre until March of that year. Petitioner was then unemployed until November 1989, when he began working for Overseas Shipyards, Inc. (Overseas), shipyard representatives providing ship building and repair services. Petitioner served as a full-time employee of Overseas, working approximately 35 hours a week.  Petitioner's position with Overseas did not involve dealing in securities.

Also during the 1989 taxable year, petitioner received a $100,000 pension distribution (from which no Federal income tax was withheld).  In addition, petitioners reported as income on their 1989 Federal income tax return $35,056.13 in wages, $5,635 in unemployment income, and $6,441 in interest and dividend

income.   During the year, petitioner bought and sold securities[1]
for his own account only, and used the "on the book" bid and
asked method exclusively in such transactions.   Petitioner also
bought and sold futures contracts for his own account.
Petitioner purchased securities from and sold securities to
registered broker-dealers only.   Petitioners claimed losses of
$224,355 from transactions in securities on Schedule C of their
1989 Federal income tax return.

In 1990, petitioner continued full-time employment with
Overseas.   During the 1990 taxable year, petitioner received a
$152,000 individual retirement account (IRA) distribution (from
which no Federal income tax was withheld).   In addition,
petitioners reported as income on their 1990 Federal income tax
return $52,062 in wages and $3,566 in interest and dividend
income.   Petitioner continued to use the "on the book" bid and
asked method for securities transactions undertaken for his own
account during the year.   Petitioner had no transactions in
futures contracts in 1990.   Petitioners claimed losses of $98,378

---

[1]During 1989 and 1990, the taxable years in issue,
petitioner primarily transacted in a variety of options positions
which, by the nature of such securities, expired within 6 months.
In one instance during the years in issue, petitioner purchased
actual stock; all remaining transactions involved options
positions.   The options positions taken and the stock purchased
are together referred to as "securities" hereinafter.

from transactions in securities on Schedule C of their 1990 Federal income tax return.

During the years in issue, petitioner purchased and sold securities and futures contracts for his own account only, and not for the account of others. With respect to petitioner's transactions in securities and futures contracts, petitioner made all purchases from, and all sales to, registered broker-dealers. Petitioner spent a substantial amount of time each week researching, reading trade publications, and devising trading strategies. This activity was conducted from petitioner's home. Petitioner did not have an established place of business for conducting securities transactions for his own account. During such time petitioner did not have a license to be a dealer in securities and did not advertise himself as a dealer in securities, nor did he maintain any customer accounts.

Petitioner was charged a commission on every security transaction made on his behalf during the years in issue. All of the gross receipts reported by petitioners on Schedule C of their Federal income tax returns for 1989 and 1990 were derived from sales of securities to broker-dealers, and none of the gross receipts were derived from commissions from the sale of securities to or on behalf of individual investors.

The dollar amounts of the losses from transactions in securities and futures contracts reported by petitioners on their

1989 and 1990 Federal income tax returns can be summarized as follows:

|  | 1989 | 1990 |
|---|---|---|
| Gross Receipts | $118,209 | $33,422 |
| Cost of Goods Sold | ( 224,712) | ( 51,733) |
| Gross Loss on Securities | ($106,503) | ($18,311) |
| Loss on Futures Contracts | ( 117,852) | 0 |
| Net Operating Loss Carryover | 0 | ( 80,067) |
| Total Claimed Ordinary Losses | ($224,355) | ($98,378) |

Petitioner continued to use the bid and asked method of buying and selling securities during part of 1991, although he ceased securities activities in that year because of his accumulated losses. Petitioners reported all of their 1991 transactions in securities on Schedule D of their 1991 Federal income tax return, claiming a net capital loss of $8,157.

Petitioners filed an application for automatic extension of time to file their 1989 Federal income tax return extending their time to file until August 15, 1990. However, the 1989 Federal income tax return was not filed until April 15, 1992. The 1990 Federal income tax return was also filed on that date.

### OPINION

In her notice of deficiency, respondent determined that the securities and futures contracts purchased and sold by petitioner during the taxable years 1989 and 1990 were capital assets within

the meaning of section 1221, and not inventory or property held primarily for sale to customers in the ordinary course of a trade or business.  Based upon this determination, respondent concluded that the losses on securities and futures transactions claimed by petitioners on Schedule C of their Federal income tax returns were reportable on Schedule D, and calculated petitioners' deduction for net capital losses subject to the limitation under section 1211.  Petitioners contend that their losses incurred during 1989 and 1990 were reportable on Schedule C because petitioner functioned as a dealer due to the frequency of transactions, the large dollar volume, the extensive time devoted, and the methods used for transacting in the market.

Section 165(f) provides a deduction for losses from sales or exchanges of capital assets, but only to the extent allowed under sections 1211 and 1212.  Section 1211(b) limits the allowance of such losses to the extent of gains from such sales or exchanges, plus the lower of (1) $3,000 ($1,500 in the case of a married individual filing a separate return), or (2) the excess of such losses over such gains.

The principal issue we must decide, therefore, is whether the losses reported by petitioners for the years in issue from dealings in securities and futures contracts are ordinary or capital losses.

We turn first to the securities. The proper treatment of these losses depends on whether the disposed assets were "capital assets". Section 1221 defines "capital asset" very broadly as "property held by the taxpayer (whether or not connected with his trade or business)" and then provides several exclusions from this definition. One such exclusion, section 1221(1), covers:

> stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

Petitioners contend that the securities disposed of in the years in issue are excluded from the definition of capital assets under section 1221(1) because petitioner essentially functioned as a dealer in such securities, and thus the securities were stock in trade or inventory or property held primarily for sale to customers within the meaning of section 1221(1).

With one exception, petitioner's securities transactions were in options. Section 1234(a)(1) provides that gains and losses from options take on the same character that the property to which the option relates would have in the hands of the taxpayer. However, this general rule does not apply to options which constitute property described in section 1221(1). Sec. 1234(a)(3)(A). Thus, the proper characterization of the losses from the options, as well as the one stock transaction, turns

upon whether these assets come within the meaning of section 1221(1).

Securities generally cannot be classified as stock in trade or inventory unless they are held primarily for sale to customers in the ordinary course of business. Van Suetendael v. Commissioner, 152 F.2d 654 (2d Cir. 1945); accord Tybus v. Commissioner, T.C. Memo. 1989-309. Whether securities are held for sale primarily to customers is a question of fact, Stern Bros. & Co. v. Commissioner, 16 T.C. 295, 313 (1951), and it has been long established by this Court that the phrase "to customers" is of paramount importance. King v. Commissioner, 89 T.C. 445, 457-458 (1987); Kemon v. Commissioner, 16 T.C. 1026, 1032 (1951); Wood v. Commissioner, 16 T.C. 213, 219-220 (1951); Tybus v. Commissioner, supra. The importance of the phrase "to customers" lies in the fact that Congress amended the predecessor of section 1221(1) in the Revenue Act of 1934 (1934 Act), ch. 277, 48 Stat. 680, to add these words (as well as the word "ordinary"), with securities trading specifically in mind, for the express purpose of denying ordinary loss treatment to speculators in securities. The legislative history of the "to customers" amendment in the 1934 Act has been explained at length in prior opinions of this Court. See King v. Commissioner, supra; Kemon v. Commissioner, supra; Wood v. Commissioner, supra. By adding the phrase "to customers", Congress intended to make it

"impossible to contend that a stock speculator trading on his own account is not subject to the [capital loss limitation] provisions of section 117."  H. Conf. Rept. 1385, 73d Cong., 2d Sess. (1934), 1939-1 C.B. (Part 2) 627, 632.

Given its clearly stated purpose, this Court and others have used the "to customers" requirement to distinguish between securities "dealers" who are intended to come within the capital asset exclusion of section 1221(1) and mere "traders" who are not.  As this Court explained in Kemon v. Commissioner, supra at 1032: "The theory of the [1934 Act] amendment was that those who sell securities on an exchange have no 'customers' and for that reason the property held by such taxpayers is not within the * * * exclusionary clause [of the predecessor of section 1221]."

All of the securities transactions of petitioner for the years in issue were undertaken on an exchange and effected through broker-dealers.  All such transactions were for petitioner's own account.  Lacking customers, petitioner cannot qualify under section 1221(1) for ordinary loss treatment for his securities transactions.

Petitioner argues that he satisfies the "to customers" requirement either because the broker-dealers who handled his orders were his customers, or because the customers of his broker-dealers should, under principles of agency law, be treated as his customers.  For the proposition that his broker-dealers

were his customers, petitioner cites <u>Commissioner v. Stevens</u>, 78 F.2d 713 (2d Cir. 1935).  <u>Stevens</u> was the Court of Appeals for the Second Circuit's affirmance of the Board of Tax Appeals' opinion in <u>Estate of Hall v. Commissioner</u>, 29 B.T.A. 1255 (1934). However, the facts in the <u>Stevens</u> and <u>Estate of Hall</u> cases are clearly distinguishable from the facts of this case.  The partnership found to be a securities dealer in those cases had an established place of business, held itself out to the general public as a securities dealer, dealt in the stock of 14 companies, and was the principal dealer in the stock of one such company, participating in nearly 70 percent of all transactions in that stock in one of the years in issue.  The Commissioner had challenged the partnership's dealer status because most of its customers were brokers on the New York Stock Exchange.  Finding that the partnership dealt in the stocks involved "primarily as a merchant", the Board concluded: "We see no reason why a broker, in such circumstances, may not properly be regarded as a <u>customer</u> of the partnership."  <u>Estate of Hall v. Commissioner</u>, <u>supra</u> at 1259.  The Board also noted that the partnership purchased from and sold to persons other than brokers.  <u>Estate of Hall v. Commissioner</u>, <u>supra</u> at 1260.  The Court of Appeals for the Second Circuit affirmed, stating: "Another broker may well be considered a customer."  <u>Commissioner v. Stevens</u>, <u>supra</u> at 714.

The facts in this case are different in all important respects, and this Court has previously rejected an interpretation of the Estate of Hall and Stevens cases that would make the dealers through whom a taxpayer buys and sells securities for his own account his "customers" for purposes of section 1221(1). Frankel v. Commissioner, T.C. Memo. 1989-39.

In Frankel, the taxpayer's purchases and sales of various government securities had all been made through primary dealers, and this Court found unpersuasive the taxpayer's invocation of Estate of Hall for the proposition that the dealers were his customers. Estate of Hall, we concluded, was "distinguishable on its facts" because the partnership therein was

> "clearly shown by the evidence to have dealt in the stocks involved primarily as a merchant. While it purchased through brokers who were members of the stock exchange and sold to brokers as principals or customers, it held itself out as a merchant of securities * * *. It also purchased from and sold to others than brokers." * * *

Frankel v. Commissioner, supra (quoting Estate of Hall v. Commissioner, supra at 1260); accord Swartz v. Commissioner, T.C. Memo. 1987-582, affd. 876 F.2d 657 (8th Cir. 1989).

Likewise, petitioner's argument that the customers of his broker-dealers should, under principles of agency, be treated as his customers for section 1221(1) purposes has been considered and rejected by this Court and the Court of Appeals for the

Second Circuit.  As the latter observed in <u>Seeley v. Helvering</u>,

77 F.2d 323, 324 (2d Cir. 1935):

> So far as * * * [the taxpayer] traded in securities on his
> own account, his sales were on the exchange to persons whom
> he did not even know; these were not his customers, but
> customers of the brokers who bought of him. * * *

 Faced more recently with the same argument, this Court stated:

> [The taxpayer] would have us look through Merrill Lynch
> and Prudential-Bache [the taxpayer's brokers] to the
> nameless members of the commodity markets who
> ultimately purchased the commodity contracts * * * [the
> taxpayer] sold and sold the commodity contracts * * *
> [the taxpayer] purchased.  Even were we to so look
> through Merrill Lynch and Prudential-Bache, * * * [the
> taxpayer] would fare no better, as members of an
> organized exchange who buy and sell securities from a
> taxpayer are not the taxpayer's "customers" within the
> meaning of section 1221(1). * * *  [<u>Swartz v.
> Commissioner</u>, <u>supra</u>.]

Accordingly, neither petitioner's broker-dealers nor their

customers constitute petitioner's customers for purposes of

section 1221(1).

In <u>Kemon v. Commissioner</u>, 16 T.C. 1026, 1032-1033 (1951),

this Court provided a delineation of the customer requirement and

its bearing on the dealer/trader distinction for holders of

securities as follows:

> In determining whether a seller of securities
> sells to "customers," the merchant analogy has been
> employed.  Those who sell "to customers" are comparable
> to a merchant in that they purchase their stock in
> trade, in this case securities, with the expectation of
> reselling at a profit, not because of a rise in value
> during the interval of time between purchase and
> resale, but merely because they have or hope to find a
> market of buyers who will purchase from them at a price
> in excess of their cost.  This excess or mark-up

represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. Such sellers are known as "dealers."

Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders." [Citations omitted.]

Petitioner apparently relies on the merchant analogy in Kemon in arguing that he should be treated as a dealer because, like a dealer, he attempted to derive his profit from the "spread" between the bid and asked prices of the securities in which he transacted, and in his view also performed a merchandising function. Petitioner claims that his "on the book" method of bid and asked for transacting in securities was highly unusual, indeed unique, for an individual. When placing an order to buy and/or sell securities with his broker-dealer, petitioner would propose prices that were "inside" the prevailing market spread between bid and asked prices. If petitioner's bid or asked price were the best available, the exchange would be required to display it. In petitioner's view, if he consummated a transaction at a price that was "inside" the spread being offered by conventional dealers, he was thereby "getting in their

way" and <u>functioning</u> as a dealer because (i) he was deriving profit from the spread, as dealers do; and (ii) he was performing a merchandising function by causing transactions to occur that might otherwise not, as dealers do.

However novel petitioner's strategy for dealing in securities may have been, we do not believe he has taken himself outside Congress's clearly expressed intention in the 1934 Act to make it "impossible to contend that a stock speculator trading on his own account is not subject to the [capital loss limitation] provisions" of the predecessor of section 1211. H. Conf. Rept. 1385, 73d Cong., 2d Sess., at 22 (1934), 1939-1 C.B. (Part 2) 627, 632. Regardless of the extent to which petitioner's strategy may have captured the spread, or facilitated market transactions, he has still failed to show he had customers. One could imagine any number of trading strategies designed to profit from the spread between bid and asked prices, or that might enhance market liquidity, but use of them would not confer dealer status on one trading for his own account. In conducting his research, and attempting to place bid and ask orders that would become the best price on an exchange, petitioner was functioning like the "trader" described in <u>Kemon</u> "whose status as to the source of supply is not significantly different from that of those to whom [he sells]." <u>Kemon v. Commissioner</u>, <u>supra</u> at 1033.

Other factors confirm that petitioner was not a dealer in the years at issue. Besides customers, petitioner also lacked an established place of business and licensing as a dealer. He did not hold himself out as a dealer or otherwise advertise such status.[2] For nearly half of 1989 and all of 1990, petitioner was a full-time employee elsewhere.

The tenuous nature of petitioner's claim of dealer status is reflected by the inconsistencies in his position. He commenced using the "on the book" method of bid and asked, his principal grounds for claiming to be a dealer, sometime in 1988. Yet on his 1988 return, he treated all losses from his securities transactions--which were sizable, exceeding $96,000--as capital losses, reporting them on a Schedule D. In 1989 and 1990, he continued using the "on the book" method and treated the substantial losses therefrom[3] as ordinary losses in each year on a Schedule C, claiming to be a securities dealer. During 1991, petitioner continued using the method, but ceased buying and

---

[2]After first stipulating that he did not advertise as a dealer, petitioner claimed at trial that his offers to buy and sell, when they were the best price for a security and therefore displayed on an exchange, constituted advertising.

[3]In 1989, petitioner claimed losses from transactions in stock options and stocks of $106,503 and from futures contracts of $117,852, for a total of $224,355 claimed on the Sched. C for that year. (The losses from futures contracts are discussed infra.) These losses resulted in an $80,067 loss carryforward, which was claimed on Sched. C of the 1990 return, together with 1990 securities losses of $18,311, for a total of $98,378 of Sched. C losses claimed in 1990.

selling securities in that year. On his 1991 return, petitioner treated the losses from securities transactions, which in this year were only $8,157, as capital losses, on a Schedule D. Questioned about his treatment of securities losses on the 1988 and 1991 returns, petitioner testified that he had been "experimenting" with the "on the book" method in 1988, but did not use it for the entire year[4], and that he did not believe the level of his activities in 1991 was sufficient to make him a dealer.[5]

We find petitioner's efforts to distinguish his situation in the respective years unpersuasive. We find more persuasive respondent's contention that the difference between taxable year 1988 and taxable years 1989 and 1990 was that in the latter two years, but not in 1988, petitioner had otherwise "unsheltered" pension and IRA distributions of $100,000 and $152,000, respectively.

There are also inconsistencies in the theory petitioner advances for the tax treatment of his losses from futures

---

[4]Petitioner's own witness, however, his broker for all stock option and stock transactions, testified that once petitioner commenced using the "on the book" method in 1988, he used it virtually exclusively until he ceased transactions in securities in 1991.

[5]The level of activity, in any event, goes to the question of whether petitioner was engaged in a trade or business, a different inquiry from whether he was a dealer. See King v. Commissioner, 89 T.C. 445, 458 (1987).

contracts reported in 1989. Petitioner claims that the losses are ordinary because he entered into the futures contracts as a hedge against the risks in his "inventory" of securities that he held as a dealer. However, petitioner also entered into futures contracts in 1988, when he did not claim to be a dealer, but did not enter into such contracts in 1990, when he did claim dealer status. Moreover, petitioner offered no evidence to indicate the link between the risks in his securities "inventory" and their offset in the futures contracts, other than his bald assertion that the futures contracts were entered into as hedges.

In addition to its evidentiary shortcomings, petitioner's hedging theory founders on the law as well. Futures contracts are, generally speaking, capital assets. Petitioner's hedging theory attempts to garner ordinary loss treatment for his futures contract losses under the Corn Products doctrine.[6] Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988), clarifies that the Corn Products doctrine "[stands] for the narrow proposition that 'hedging' transactions that are an integral part of a business' inventory-purchase system fall within [section 1221(1)]". Arkansas Best Corp. v. Commissioner, supra at 212-213. Since we have concluded that petitioner was not a dealer in the years in issue, he did not have inventory within the meaning of section

_____

[6]Corn Prods. Ref. Co. v. Commissioner, 350 U.S. 46 (1955).

1221(1) with respect to which a hedge could be taken, under the holding of Arkansas Best.

Petitioner also cites section 1236 to support his contention that he is entitled to ordinary loss treatment, on the grounds that he did not identify any securities sold in 1989 and 1990 as held for investment, as provided in that section. Section 1236 does not help petitioner's case. The operative provisions of section 1236 do not confer dealer status; they presuppose it, and go on to provide a mechanism under which a dealer can obtain capital treatment for certain assets in inventory by identifying them in advance as held for investment. Failure to make a designation under section 1236 is simply not probative in determining whether a taxpayer is or is not a securities dealer.[7]

The second issue for decision is whether petitioners are liable for an addition to tax under section 6651(a)(1) for each of the taxable years in issue. Section 6651(a)(1) provides an addition to tax for failure to file a Federal income tax return by its due date (determined with regard to extensions), unless the taxpayer shows that such failure was due to reasonable cause

---

[7]Sec. 1236 itself contains no definition of a securities dealer. However, the regulations thereunder, at sec. 1.1236-1(c)(2), Income Tax Regs., cross-reference the regulations under sec. 471 for a definition of a dealer in securities. The latter regulations, like Kemon v. Commissioner, 16 T.C. 1026 (1951), use a merchant analogy and require an "established place of business." See sec. 1.471-5, Income Tax Regs. To the extent this regulatory definition bears on this case, we believe petitioner cannot meet it.

and not willful neglect. The taxpayer bears the burden of proving both. United States v. Boyle, 469 U.S. 241, 245 (1985). A showing of reasonable cause requires that the taxpayer demonstrate that he exercised ordinary business care and prudence, but nevertheless was unable to file the return within the prescribed time. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; see also United States v. Boyle, supra at 246.

Petitioner claims to have reasonable cause for failing to timely file his 1989 and 1990 Federal income tax returns based upon his belief that a return was not required because his securities losses exceeded his income in such years. The mere fact that petitioner mistakenly believed he owed no tax does not constitute reasonable cause for failure to file a return on or before its due date. Linseman v. Commissioner, 82 T.C. 514, 523 (1984). Moreover, there is no evidence that petitioner obtained professional advice in forming his belief that he owed no tax. Cf. Cohen v. Commissioner, T.C. Memo. 1996-546.

Petitioner also argues that reasonable cause exists based upon the fact that he was "depressed", although his testimony was quite sketchy in this regard. In order for such condition to constitute reasonable cause, petitioner must show that his depression incapacitated him to such a degree that he was unable to file his returns. Williams v. Commissioner, 16 T.C. 893, 906 (1951). The fact that petitioner was functioning as a full-time

employee and actively transacting in the securities market during this period indicates that he was not incapacitated to such a degree.

Additionally, no evidence has been presented with respect to petitioner Jane Marrin's failure to file. Where a taxpayer has not taken steps to assure that a spouse has filed their joint return in a timely manner, the mere fact that one spouse assumed the responsibility for filing, and failed to do so, does not of itself provide the other spouse with reasonable cause for failure to file. <u>Belk v. Commissioner</u>, 93 T.C. 434, 447 (1989).

Petitioners have failed to show that their failure to timely file their returns during the years in issue was due to a reasonable cause and not willful neglect, and, therefore, petitioners are liable for the addition to tax under section 6651(a)(1) for each of the years in issue.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.