T.C. Memo. 2009-142

UNITED STATES TAX COURT

BRUCE A. AND DONNA M. RICE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10669-07.                    Filed June 16, 2009.

<u>Robert E. Reetz, Jr.</u> and <u>Carleton A. Davis</u>, for petitioners.

<u>Huong T. Bailie</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined a $39,250 deficiency
in petitioners' Federal income tax and a $7,850 accuracy-related
penalty under section 6662 for 2004.[1]  After concessions, there

_____

[1]All section references are to the Internal Revenue Code for
the year at issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure, unless otherwise indicated.

are two issues for decision.[2]  The first issue is whether proceeds from the sale of excess lots are properly classified as capital or ordinary under section 1221(a).  Resolution of this issue depends on whether the excess lots were held primarily for sale to customers in the ordinary course of business or were held for investment purposes.  We hold that the excess lots were held for investment purposes and the proceeds are capital gains and losses.  The second issue is whether petitioners are liable for the accuracy-related penalty under section 6662.  We hold that they are not.

                           FINDINGS OF FACT

    The parties have stipulated some facts.  The stipulation of facts and the accompanying exhibits are incorporated by this reference and are so found.  Petitioners resided in Texas when they filed the petition.

    Petitioners live and work in Texas, where they have a business that designs and administers 401(k) plans and manages investments for trust instruments, 401(k) plans, and individuals.  Mr. Rice is a certified public accountant (CPA) and did tax planning and consulting work at accounting firms before he and his wife started their own business.  Petitioners were successful in this business, reporting income in excess of a million dollars

---

[2]Respondent included alternative figures regarding the calculation of basis but provided insufficient information for us to address this issue.

each year from their business. They provided an accountant with information regarding their finances for 2004, and he prepared the income tax return they filed.

Petitioners' Dream Home

Petitioners were looking to purchase a lot in Austin to build their dream home. Petitioners looked at two other properties before settling on the lot they purchased. The first property included half-acre lots for $200,000 each, but petitioners would have needed to buy at least two lots for their dream home. The second property they considered offered larger lots but was in an undesirable location.

Petitioners saw a sign advertising 14.4 acres of undeveloped property in a desirable location near a preserve. They took down the sign, put it in their car, and made an inquiry the same day. Petitioners purchased the property within a week for $300,000 with no financing. The property was for sale as a unit--it was not subdivided, and petitioners had no option to purchase a portion of it.

Petitioners initially wanted to keep the entire property for themselves for their dream home. Ultimately, Mrs. Rice changed her mind. Mr. Rice still wanted to keep the entire property and build a single home for them and their two children. But Mrs. Rice decided that she did not want to live on the property alone for fear of feeling isolated. Mr. Rice wanted the house to be

his wife's dream home, so he relented.  They decided to subdivide the property to share it with others.

## Division of the Property

Petitioners had never engaged in the sale of real estate other than sales of their own personal residences before they purchased this property, nor have they engaged in it since. Petitioners first identified the portion of the property they wanted for their lot.  This lot was the largest and was in a desirable place on the property.

Petitioners had to hire consultants for zoning, access, water and wastewater service, construction, and environmental issues.  After they decided to subdivide the property, they hired a consultant to provide a subdivision layout.  Petitioners applied for and received a zoning change to subdivide and develop the property.  Petitioners divided the property into ten smaller lots, reserving eight lots for homes and two lots for environmental purposes.

## Construction of Their Dream Home

Petitioners were building their dream home, and they wanted to create a certain aesthetic for their home and its surroundings.  They changed the name of the subdivision from Mesa Vista to Sette Terra after seeing Cinque Terre on a trip to the Italian Riviera.  They did not want just any neighbors.  They wanted neighbors with money.  They registered the subdivision for

a homeowner's association and executed a declaration of covenants, conditions and restrictions, which applied to all the lots in the subdivision (other than Lots 9 and 10 that fell outside the subdivision).

Petitioners took two years to construct their dream home. They hired an architect to build it in an Italian style. The home has 8,000 square feet of interior space and 4,000 square feet of garages and porches. Petitioners devoted a significant amount of their spare time to building their home, and their home was the focus of their attention.

## Sales and Advertising Activities

Petitioners did not devote much time to selling the excess lots. They made their first lot sale to friends in 2000. In 2002, two years after their first sale, they placed a wooden sign at the entrance to the subdivision advertising that Sette Terra had lots available for sale. This was their only advertising. Petitioners sold all their lots through word of mouth rather than the sign or other advertising.

## The 2004 Lot Sales

Petitioners sold Lots 1, 9, and 10 next, the lots at issue. Lots 9 and 10 were excess lots that were sold together because only one of them was suitable for construction. These sales occurred in 2004, four years after the first sale and two years after petitioners displayed the sign.

Petitioners sold Lots 9 and 10 at a loss to Mrs. Rice's sister and her husband (related party sale). Petitioners sold another excess lot, Lot 1, to friends the same year, and they realized an $89,329.79 gain from that sale.

Remaining Lot Sales

Petitioners eventually sold the four remaining excess lots (one of which was an environmental lot attached to another property) to friends and acquaintances, reserving a lot for their daughter. These sales occurred in 2005, 2007, and 2008 but are not at issue.

Petition

Respondent issued a deficiency notice challenging petitioners' characterization of the sales of Lots 1, 9, and 10 in 2004. Respondent also challenged the loss petitioners claimed for the related party sale. Petitioners timely filed a petition for redetermination with this Court.

OPINION

This case presents two issues. We discuss each in turn.

I. Capital Gain or Ordinary Income

This first issue is whether petitioners who purchased a property to build their dream house properly claimed capital gains treatment on their sale of Lot 1. The answer depends upon whether petitioners held the property primarily for sale to customers in the ordinary course of business or if it was held,

alternatively, as a capital asset.  If they held the property primarily for sale in the ordinary course, as respondent argues, the proceeds to petitioners will be treated as ordinary income and we must sustain respondent's determination with respect to that income.  If the property was held as a capital asset, then we must find for petitioners on this issue.

A.  Section 1221

The parties agree that we must look to section 1221 to determine whether the property petitioners sold was held primarily for sale to customers in the ordinary course of their trade or business, so as to be denied treatment as a capital asset.[3]  A "capital asset" is broadly defined as property held by the taxpayer, whether connected with his or her trade or business, subject to a number of exceptions.  Sec. 1221(a). These exceptions include stock in trade, property of a kind that is properly included in a taxpayer's inventory, and property held primarily for sale to customers in the ordinary course of a taxpayer's trade or business.  Sec. 1221(a)(1).

The United States Supreme Court has defined "primarily" as used in this context to mean "principally" or "of first importance."  Malat v. Riddell, 383 U.S. 569, 572 (1966); Biedenharn Realty Co. v. United States, 526 F.2d 409, 422-423 (5th Cir. 1976).  The question of whether property is held

_____

[3]They agree that sec. 1237 does not apply.

primarily for sale to customers in the ordinary course of a taxpayer's business is "purely factual," and to answer it, we look to the taxpayer's intent at the time he or she disposes of the property. Pritchett v. Commissioner, 63 T.C. 149, 162 (1974); Raymond v. Commissioner, T.C. Memo. 2001-96 (citing Cottle v. Commissioner, 89 T.C. 467, 487 (1987)). Generally, we examine several different factors[4] when analyzing such a scenario, including: (1) The taxpayer's purpose in acquiring the property; (2) the purpose for which the property was subsequently held; (3) the taxpayer's everyday business and the relationship

---

[4]The Court of Appeals for the Fifth Circuit, where appeal in this case would lie, has enumerated similar factors to determine whether property is held for investment or for sale: (1) The nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. United States v. Winthrop, 417 F.2d 905, 909-910 (5th Cir. 1969). All factors are not equal. Suburban Realty Co. v. United States, 615 F.2d 171 (5th Cir. 1980); Biedenharn Realty Co. v. United States, 526 F.2d 409 (5th Cir. 1976). Substantiality and frequency of sales are among the most important factors, and improvements to land, solicitation and advertising efforts and brokerage activities also play a significant role in the analysis. Biedenharn Realty Co. v. United States, supra at 416-417. The taxpayer's claim to capital gain is accorded greater deference when sales are few and isolated, rather than when they are particularly numerous and extend over a long period. Id. at 416. Our holding would be the same under these similar factors.

of the income from the property to total income; (4) the frequency, continuity, and substantiality of sales of property; (5) the extent of developing and improving the property to increase the sales; (6) the extent to which the taxpayer used advertising, promotion, or other activities to increase sales; (7) the use of a business office for the sale of property; (8) the character and degree of supervision or control the taxpayer exercised over any representative selling the property; and (9) the time and effort the taxpayer habitually devoted to the sales. Biedenharn Realty Co. v. United States, supra at 415; United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); David Taylor Enters., Inc. v. Commissioner, T.C. Memo. 2005-127; Wood v. Commissioner, T.C. Memo. 2004-200, affd. 138 Fed. Appx. 168 (11th Cir. 2005). These factors are meant only to aid the finder of fact in determining, on the entire record, the taxpayer's primary purpose for holding property. They have no independent significance, and individual comment on each factor is not necessary or required. Wood v. Commissioner, supra.

B. Analysis

We now apply these factors to the facts of this case. Petitioners purchased the property to build their dream home. The record demonstrates that they sold the excess lots to dispose of unwanted property, not that they purchased the property primarily for sale to customers in the ordinary course of

business.  Petitioners looked at other properties, but the one they purchased was in the school district where they wanted to live, provided them with enough space to build their dream home, and was much cheaper than the other properties they considered purchasing.  Petitioners did not have the option to buy a smaller portion of the property.  When petitioners initially purchased the property, they wanted to build a single-family home on it.  They planned a series of improvements to the property.  During this period Mrs. Rice decided that she wanted neighbors.  Petitioners disposed of the excess lots after subdividing the property and creating a homeowner's association so that they could ensure a certain aesthetic and create a neighborhood.  In doing so, they were protecting their home value and their investment by creating that aesthetic.

The number of lots petitioners sold in toto was small.  The Court of Appeals for the Fifth Circuit, to which this case is appealable, has held that substantiality and frequency of sales is among the most important factors.  Biedenharn Realty Co. v. United States, supra at 416-417.  Petitioners did not sell an average of a lot a year.  Among the eight lots suitable for construction, they sold one lot in 2000, three lots in 2004, one lot in 2005, one lot in 2007, and one lot in 2008, and they are holding one in reserve for their daughter.  These sales are few and infrequent in comparison to the sales in the cases respondent

cites.  See, e.g., <u>Biedenharn Realty Co. v. United States</u>, <u>supra</u> at 411; <u>United States v. Winthrop</u>, <u>supra</u> at 907.  The taxpayers in <u>Winthrop</u> sold 456 lots, while the taxpayers in <u>Biedenharn Realty Co.</u> sold 158 lots.  <u>Biedenharn Realty Co. v. United States</u>, <u>supra</u> at 411; <u>United States v. Winthrop</u>, <u>supra</u> at 907; This case is more consistent with <u>Ayling v. Commissioner</u>, 32 T.C. 704, 706 (1959), cited by petitioners in which proceeds from sales of 13 lots over the course of four years were held to be eligible for capital gains treatment.

Petitioners made significant improvements to develop and sell the excess lots.  We note, however, that many of those improvements would have been necessary even had they not subdivided the property.  Building their own residence on the property required significant expenditures for improvements.

Solicitation and advertising efforts and brokerage activities are also significant factors in analyzing whether property sales are eligible for capital gains or ordinary treatment.  <u>Biedenharn Realty Co. v. United States</u>, <u>supra</u> at 416-417.  Petitioners devoted very little time to the sale of the excess lots.  The lots were sold primarily to friends, friends of friends, and relatives.  Other than posting a sign outside the subdivision, petitioners did not advertise or promote the sale of lots.  Petitioners' solicitation and advertising efforts are more characteristic of those of investors than of dealers.

Finally, petitioners had full-time jobs and devoted little time to the sale of the excess lots. Lot sales accounted for a small percentage of their income each year, and petitioners retained the proceeds rather than buying additional inventory. Petitioners were not real estate developers, had never developed land before, and have never developed land since. We conclude that petitioners purchased the property as an investment and not as property held for customers in the ordinary course of business. The gain from the sale of excess Lot 1 is entitled to capital gains treatment.

C. Sale to a Related Party

Petitioners claimed a loss from the related party sale. Respondent claims that petitioners are not entitled to recognize the loss. Petitioners do not address this issue on brief, and we treat petitioners as having abandoned the issue. See Rule 149(b). Accordingly, petitioners are not entitled to a deduction for this loss, and we hold for respondent on this issue.

II. Accuracy-Related Penalty

We finally consider whether petitioners are liable for the accuracy-related penalty under section 6662(a). Petitioners properly claimed capital gains treatment from the sale of Lot 1 and maintained adequate records. They also cooperated with the audit of their taxes. Mr. Rice is a CPA. He and Mrs. Rice provided their records to their accountant, who prepared their

income tax returns.  Based upon all of the facts and circumstances, we hold that petitioners are not liable for the accuracy-related penalty.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.