T.C. Memo. 2012-193

UNITED STATES TAX COURT

DARRON L. BENNETT AND JILL N. BENNETT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30490-09.                    Filed July 12, 2012.

R determined deficiencies and penalties for Ps' 2001-04 tax
years. The primary issue is whether petitioners had a loss on the sale
of property for the 2001 tax year and if so, whether the loss is properly
characterized as personal, capital, or ordinary and may be carried
forward to petitioners' 2002, 2003, and 2004 returns.

<u>Held</u>: The property was a capital asset, and petitioners are liable
for the portion of the deficiency in income tax attributable to the sale of
the property as determined in this opinion.

<u>Michael Charles Cohen</u>, for petitioners.

<u>Scott B. Burkholder</u>, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge: This case is before the Court on a petition for redetermination of deficiencies in income tax and penalties respondent determined for petitioners' 2001 through 2004 tax years.[1]

After concessions the issues remaining are:[2]

(1) whether petitioners had a loss of $1,337,325 on the sale of property at 11434 Bellagio Road, Bel Air, California (Bellagio property), for the 2001 tax year and if so, whether the loss is properly characterized as personal, capital, or ordinary

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the taxable years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioners concede that Jill Bennett had unreported income from Buttercup Apparel of $55,000 and $25,400 for the 2001 and 2002 tax years, respectively. Petitioners concede that Jill Bennett had unreported income reported on Forms 1099-MISC, Miscellaneous Income, of $2,010, $42,397, and $17,071, for the 2002, 2003, and 2004 tax years, respectively. Petitioners have also conceded that Jill Bennett had additional unreported income for 2002 of $547. The parties agree that the cost basis of the Bellagio property is not less than $4,335,471. Respondent concedes that petitioners are not liable for 2001 for capital gains tax allegedly arising from the sale of the Bellagio property. Petitioners concede additions to tax under sec. 6651(a)(1) and (2) to the extent there is a tax deficiency for the years at issue. Petitioners concede the sec. 6662(a) penalty for the years at issue to the extent there is a tax deficiency except that respondent concedes that for any deficiency arising out of the sale of the Bellagio property the sec. 6662(a) penalty shall not apply.

and may be in part deducted in 2001 and in part carried forward and deducted on petitioners' 2002, 2003, and/or 2004 Federal income tax returns,

(2) whether the basis of the Bellagio property should include $125,000 of interior decorating fees,

(3) whether petitioner Mrs. Jill Bennett received unreported income from Hajan Enterprises, Inc., of $85,000 for the 2002 tax year, and

(4) whether petitioner Mr. Darron L. Bennett received unreported income of $47,069 for the 2002 tax year.

## FINDINGS OF FACT

The parties' stipulation of facts, with accompanying exhibits, and the stipulation of settled issues are incorporated herein by this reference. At the time the petition was filed, petitioners resided in California.

Petitioners' Personal Background

Petitioner Mr. Bennett is a self-proclaimed "serial entrepreneur", often trying his hand at unsuccessful businesses. In the 1980s Mr. Bennett's father passed away, leaving him a substantial amount of jewelry. Mr. Bennett then began selling jewelry, which later evolved into a jewelry brokering business.

In the early 1990s Mr. Bennett went into a business of "club promoting", in which he would book a concert and then promote the concert nightclub. When that

business was unsuccessful he then tried the record and recording business, which was also unsuccessful. In 1996 Mr. and Mrs. Bennett and Mrs. Bennett's father attempted to start a vitamin sales business. At some point Mr. Bennett also engaged in a car leasing business.

According to the 1997 Form 1120S, U.S. Income Tax Return for an S Corporation, petitioners incorporated Johnson Investment on February 8, 1995. Petitioners explained that although the "Business Code" used on their Federal income tax returns referred only to some form of a jewelry business, they actually "did a lot of things under Johnson Investment."

Mrs. Bennett engaged in a term life insurance business beginning in early 2000 and continuing through the years at issue. She would try to place clients with an insurance carrier that the client could afford. Mrs. Bennett opened a bank account for Buttercup Apparel. Mrs. Bennett deposited a check, dated March 7, 2002, from Hajan Enterprises, Inc., for $65,000 in this account. Mrs. Bennett deposited another check from Hajan Enterprises, Inc., dated June 26, 2002, for $20,000 in Buttercup Apparel's account. Ms. Sharon Sumter, a family friend of the Bennetts, was in the business of real estate development and owned Hajan Enterprises, Inc.

During the years at issue petitioners owned and lived in a property in Henderson, Nevada (Henderson property). Petitioners refinanced the Henderson property in early May 2000 and checked the "Declarations" box on page 3, Section VIII of the loan application, stating that they intended to occupy the property as their personal residence.

On March 31, 2000, Mr. Bennett was arrested in Los Angeles on Federal drug charges. He was transferred to New York, where he was imprisoned until his acquittal on January 25, 2001.

Bellagio Property

Mr. Bennett was at the office of an attorney, Mr. Roger Rosen, who was looking at blueprints for a residential property. Mr. Rosen asked Mr. Bennett whether he was interested in investing in the property. Mr. Bennett was already familiar with this property; however, because Mr. Rosen wanted to build an English Tudor style house and Mr. Bennett did not think that would sell, he declined.

A few months later Mr. Rosen called Mr. Bennett and explained that he was getting out of the real estate business and asked Mr. Bennett whether he would like to buy the property. Mr. Bennett was interested in the property, but before he bought it, he contacted his architect/builder friend Mr. Harry Fox. Mr. Fox was

available and thought that they could build a "nice house" on the property. Mr. Bennett and Mrs. Bennett (Miss Johnson at the time) purchased the property from Mr. Rosen as joint tenants with the right of survivorship. The grant deed was filed on January 14, 1997.

Mr. Fox owned a property in Aspen, Colorado, that had a mortgage that was about to be foreclosed on and offered to develop the Aspen property with Mr. Bennett. Mr. Bennett then made an agreement with Mr. Fox to develop the Aspen property along with the Bellagio property. The Aspen property was never developed and was eventually sold.

Mr. Bennett was intensely involved in the development of the Bellagio property. Even though his family home was in Nevada, Mr. Bennett determined he spent roughly 85% of his time at the Bellagio property. Mr. Bennett put a trailer on the Bellagio property to use as an office.

Mrs. Bennett was responsible for the "design side" and "overall look and feel" of the Bellagio property. Mrs. Bennett worked with an interior decorator named David Speeks who owned Tasty Designs. Mrs. Bennett worked with him in order to design the interior of the house into something that would sell. Petitioners paid Mr. Speeks and/or Tasty Designs $125,000 for his services.

The Bennetts refinanced the Bellagio property on June 7, 1999, for a total amount of $2,500,000. On the signature page of the loan documentation the Bennetts checked a box in section VIII line L signifying that they planned to occupy the property as their primary residence.

The Bennetts again refinanced the Bellagio property on December 27, 2000, for a total amount of $3,250,000. This time, on the signature page of the loan documentation the Bennetts checked a similar line L box signifying that they did not plan on occupying the property as their primary residence. The Bennetts received $1,059,141.08 from the refinance as cash to borrower.

Petitioners sold the Bellagio property on December 3, 2001, for $4 million in order to "stop the bleeding". Maryann Tyler, a friend of Mr. Bennett's, was the listing agent for the sale of the Bellagio property. The house was unfinished when it was sold by the Bennetts, and after selling the Bellagio property they never invested in real estate again during the tax years at issue.

Tax Returns

Greg Hookfin prepared petitioners' tax returns for the years at issue. Mr. Bennett provided Mr. Hookfin with his bank statements, and Mr. Hookfin calculated the Bennetts' tentative income by adding up the amounts Mr. Bennett had deposited into his account. Mr. Bennett would then estimate the amount of money that he

received that was not reflected in his bank accounts. Petitioners did not list any business expense deductions on any of their Schedules C, Profit or Loss From Business, for the years at issue. Mrs. Bennett engaged in businesses but did not report income on separate Schedules C for the years at issue.

On their 2001 tax return petitioners reported Mr. Bennett's Schedule C business as "Diamond Broker". On their 2002 tax return petitioners indicated Mr. Bennett was a salesman and reported Mr. Bennett's Schedule C business as "DIAMOND BROKER/JEWELRY SALES". On their 2003 and 2004 returns petitioners indicated Mr. Bennett was a "Diamond Broker" and reported Mr. Bennett's Schedule C business as "Jewelry Sales". Mr. Bennett included income from other activities on these Schedules C. However, Mr. Bennett did not indicate on his returns that his income came from any source except for the jewelry business.

On petitioners' 2001 tax return they deducted $1,377,325 on Form 4797, Sales of Business Property, for the sale of the Bellagio property. They reported a sales amount of $4,000,000 and a basis of $5,377,325. This sale was not related to the "Diamond Broker" business reported on the only Schedule C included with this return.

For the years at issue petitioners reported the following Schedule C income, Schedule C expenses, Other taxable income, Net Operating Loss (NOL) Carryforward, and Adjusted Gross Income (AGI):

|  | 2001 | 2002 | 2003 | 2004 |
| --- | --- | --- | --- | --- |
| Schedule C income | $46,300 | $342,889 | $450,455 | $472,254 |
| Schedule C expenses | 0 | 0 | 0 | 0 |
| Other taxable income | (1,377,325) | 487 | 416 | 398 |
| NOL carryforward | 0 | (342,889) | (450,455) | (146,581) |
| AGI | (1,334,296) | (9,369) | (11,010) | 314,297 |

On October 2, 2009, respondent sent to petitioner a notice of deficiency. On December 23, 2009, petitioner timely petitioned the Court for redetermination of the deficiency.

OPINION

I. Burden of Proof

The Commissioner's determination of a taxpayer's liability for an income tax deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the determination is improper. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The Court of Appeals for the Ninth Circuit, to which an appeal would lie absent a stipulation to the contrary, has held that in unreported income cases, the presumption of correctness applies only after the Commissioner introduces some substantive evidence that the taxpayer received unreported income. Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982); Weimerskirch v. Commissioner, 596 F.2d 358, 360-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). If the Commissioner introduces such evidence, "the burden shifts to the taxpayer to show by a preponderance of the evidence that the deficiency was arbitrary or erroneous." See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97.

Respondent used the specific income items method, which is a direct method of proof approved by the Court. See Price v. Commissioner, T.C. Memo. 2004-103. By introducing their Schedules C and the banking information of Mr. and Mrs. Bennett respondent has introduced sufficient evidence connecting petitioners with the unreported income. Consequently, respondent's determination is entitled to the presumption of correctness.

II.    Recordkeeping Requirements

Taxpayers must maintain adequate records to substantiate their income and deductions. Sec. 6001 (the taxpayer "shall keep such records"); INDOPCO, Inc. v.

Commissioner, 503 U.S. 79, 84 (1992). As in this case, when taxpayers fail to maintain adequate books and records, the Commissioner is authorized to use whatever method he deems appropriate to determine the existence and amount of the taxpayers' income so long as, in the Commissioner's reasonable opinion, the method clearly reflects income. Sec. 446(b); Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 148 (5th Cir. 1983); Gowni v. Commissioner, T.C. Memo. 2004-154.

III.   Bellagio Property

Respondent makes three arguments with respect to the treatment of the sale of the Bellagio property. First, respondent argues that petitioners purchased the property and constructed the house as their personal residence and therefore any loss incurred in the sale of the property is not deductible under section 165(c).[3] Second, respondent argues that if the property was converted to nonresidential property, the conversion value of the property is limited to the lesser of the adjusted basis or fair market value at the time of the conversion. Finally, respondent argues that under section 1221 the property was not held primarily for sale to customers in

_____

[3]Sec. 165(c) limits losses that can be deducted by individual taxpayers, permitting a deduction only for losses incurred in a trade or business, in a profit-making activity (though not connected with a trade or business), or from a casualty or theft.

the ordinary course of petitioners' trade or business and therefore any loss incurred on the sale of the property is a capital loss and not an ordinary loss.

A.    Personal Residence

At trial petitioners testified that they never planned on living in the Bellagio property. However, respondent vehemently argues that petitioners purchased the property as their primary residence and that their "intent is clearly shown in the many documents they signed stating that the Bellagio property was to be their primary residence".

On the loan documents used to refinance the Bellagio property on June 7, 1999, for a total loan amount of $2,500,000, the Bennetts did check a box signifying that they planned to occupy the property as their primary residence. The Bennetts also signed a fair lending notice certifying that they planned to occupy the Bellagio property. However, Mr. Fox, petitioners' architect/developer, explained that he did not get the impression that the Bellagio project was going to be a residence for them and he explained "that a lot of developers that I work with always say it's their house because they get better financing from the bank as opposed to disclosing it's a business entity."

The Bennetts also purchased their personal residence, the Henderson property, around the same time that they purchased the Bellagio property and intended to live in it. We conclude that petitioners did not intend to occupy the Bellagio property as their personal residence.

B.    Conversion

Because we find that petitioners never intended to occupy the Bellagio property as their personal residence, the property was never converted from residential to nonresidential property.

C.    Section 1221

Respondent argues that "under section 1221 and Biedenharn Realty Co. [v. United States, 526 F.2d 409, 414-415 (5th Cir. 1976)] and related cases, the Bellagio property was not 'property held by [petitioners] primarily for sale to customers in the ordinary course of [their] trade or business.'" Therefore respondent disallowed the ordinary loss petitioners claimed on their 2001 tax return.

Section 1221 defines all property held by a taxpayer as a "capital asset" and then explicitly excludes eight categories of property.[4] Petitioners argue that the

---

[4]Sec. 1221(a) provides in pertinent part as follows:

(continued...)

Bellagio property was not a capital asset because it falls within the first exception

and was held primarily for the sale to customers in the ordinary course of their trade

or business and therefore any loss incurred with respect to the property is ordinary.

The Court of Appeals for the Ninth Circuit has explained that:

> We have looked to a number of factors in determining whether
> properties are "held . . . primarily for sale to customers in the ordinary
> course of . . . business," I.R.C. §1221, including "the nature of the
> acquisition of the property, the frequency and continuity of sales over
> an extended period, the nature and the extent of the taxpayer's
> business, the activity of the seller about the property, and the extent
> and substantiality of the transactions." Austin v. Commissioner, 263
> F.2d 460, 462 (9th Cir. 1959). See Parkside, Inc. v. Commissioner,
> 571 F.2d 1092, 1096 (9th Cir. 1977); Los Angeles Extension Co. v.
> United States, 315 F.2d 1, 2-3 (9th Cir. 1963). But we have also
> warned that "each case must be decided upon its particular facts, and
> the presence of any one or more of these factors may or may not be
> determinative of a particular case." Austin v. Commissioner, supra,
> 263 F.2d at 462.

---

[4](...continued)

SEC. 1221.  CAPITAL ASSET DEFINED.

　　(a) In General.--For purposes of this subtitle, the term "capital asset"
means property held by the taxpayer (whether or not connected with his trade
or business), but does not include--

　　　　(1) stock in trade of the taxpayer or other property of a kind
which would properly be included in the inventory of the taxpayer if on
hand at the close of the taxable year, or property held by the taxpayer
primarily for sale to customers in the ordinary course of his trade or
business;

Redwood Empire Savings & Loan Ass'n v. Commissioner, 628 F.2d 516, 517 (9th

Cir. 1980), aff'g 68 T.C. 960 (1977).[5]

### 1. Nature of the Acquisition

Although initially Mr. Bennett was not interested in investing in the property

when the design was not to his liking, after Mr. Rosen decided to sell the property,

Mr. Bennett did express interest.  However, before deciding to purchase

the Bellagio property he contacted his architect/builder friend Mr. Fox to make sure

he was available and that they could build a house on the property.

---

[5]Under Golsen we apply the factors of the Court of Appeals to which the case is appealable.  Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 455 F.2d 985 (10th Cir. 1971).  We note that this Court also examines

> [S]everal different factors when analyzing such a scenario, including: (1) The taxpayer's purpose in acquiring the property; (2) the purpose for which the property was subsequently held; (3) the taxpayer's everyday business and the relationship of the income from the property to total income; (4) the frequency, continuity, and substantiality of sales of property; (5) the extent of developing and improving the property to increase the sales; (6) the extent to which the taxpayer used advertising, promotion, or other activities to increase sales; (7) the use of a business office for the sale of property; (8) the character and degree of supervision or control the taxpayer exercised over any representative selling the property; and (9) the time and effort the taxpayer habitually devoted to the sales.  [Citations omitted.]

Rice v. Commissioner, T.C. Memo. 2009-142.

We found above that petitioners did not purchase the Bellagio property to build a private residence, but to build a house that would sell. We find that this factor weighs in favor of finding that the Bellagio property was property held primarily for the sale to customers in petitioners' ordinary course of business.

### 2. Frequency and Continuity of Sales

Petitioners purchased the Bellagio property and held it for almost five years before eventually selling it in an unfinished condition at a loss. Petitioners also participated in the Aspen property; however, the record is extremely sparse regarding the Aspen property and it was never developed. Petitioners developed only the Bellagio property.

Although petitioners point to a couple of cases that hold that very few sales can still qualify for a finding that the property was held primarily for the sale to customers in the ordinary course of business, we do not find that the facts of this case weigh in favor of finding that the Bellagio property was held for sale in the ordinary course of business. As this Court explained in Finnegan v. Commissioner, T.C. Memo. 1997-486, aff'd without published opinion, 168 F.3d 498 (9th Cir. 1999), the two cases petitioners point to, S&H, Inc. v. Commissioner, 78 T.C. 234 (1982), and Morley v. Commissioner, 87 T.C. 1206 (1986), can be distinguished from the case at hand.

The Court in <u>Finnegan</u> explained that the holding in <u>S&H, Inc.</u> focused on the fact that a preexisting arrangement existed to sell the property when the taxpayers purchased and developed the property. <u>Finnegan v. Commissioner</u>, T.C. Memo. 1997-486. The Court in <u>Finnegan</u> also elaborated on this point noting: "[A] taxpayer engaged in a single venture can be found to be in a trade or business in 'situations where, at the time the property was acquired by the taxpayer, he intended promptly to resell the property <u>and</u> the objective facts show that he proceeded to attempt to implement that intent'. <u>Morley v. Commissioner</u>, <u>supra</u> at 1211." Petitioners, like the taxpayers in <u>Finnegan</u>, were never licensed real estate brokers, did not have a preexisting contract to sell the house, and simply did not meet their burden of showing that their Bellagio real estate activity was a trade or business rather than an investment. <u>See id.</u> In sum "[t]he number of lots petitioners sold in toto was small." <u>Rice v. Commissioner</u>, T.C. Memo. 2009-142. And we are not convinced that petitioners were in the business of real estate development but rather that they held the Bellagio property for investment purposes. We find this factor weighs against petitioners.

> 3. <u>Nature and Extent of the Bennetts' Business</u>

The Bennetts are self-described serial entrepreneurs. Petitioners were primarily engaged in a jewelry business and reported all of their income on a single

Schedule C under that business. Although petitioners credibly testified that they had other sources of income which they also reported on the jewelry business's Schedule C, they did not document any of the other businesses. We find it incredible that petitioners ran a fully functioning real estate business but reported it on their returns as a jewelry business. Before investing in the Bellagio and Aspen properties petitioners had not invested in real estate, other than their home in Nevada, and after the Bellagio property they never invested in real estate again. We find this factor weighs against petitioners.

### 4. Activity of the Seller

Petitioners hired a friend as their realtor. There is no indication in the record that petitioners ever tried to advertise the Bellagio property or that they did anything particular to prepare for the sale of the property. In fact petitioners explained that they were just trying to be rid of the property. We find that this factor weighs against petitioners.

### 5. Conclusion

After analyzing the relevant factors and the specific facts of this case, we do not find that the Bennetts held the Bellagio property in the ordinary course of their trade or business for sale to customers. Therefore, the loss realized from the sale of the Bellagio property was a capital loss and not an ordinary loss.

IV.    $125,000 of Interior Decorating Fees

Respondent disputes $125,000 petitioners claim should be included in the basis of the Bellagio Property.  Respondent argues that the checks submitted in evidence are mere carbon copies and do not substantiate the expense.  However, we find Mrs. Bennett's testimony in addition to the carbon copies of the checks sufficient to substantiate the fact that petitioners worked with David Speeks of Tasty Designs and paid $125,000 for his services.

Mrs. Bennett explained that she used an interior designer during construction of the Bellagio property because she wanted the inside of the house to also be designed in a manner that would sell.  The checks written to David Speeks and Tasty Designs were written in 1998 and 1999, which was the period the house was under construction.  Because the $125,000 paid to David Speeks and Tasty Designs was an amount paid for the design of a new building, it must be capitalized.  See sec. 1.263(a)-1(a)(1), Income Tax Regs.  We conclude that the Bennetts must include the $125,000 in the basis of the Bellagio property.  Therefore petitioners' basis in the Bellagio property is $4,460,471 ($4,335,471 (see supra note 2) + $125,000).

V.  $85,000 From Hajan Enterprises, Inc.

In 2002 Mrs. Bennett deposited two checks from Hajan Enterprises, Inc. Mrs. Bennett explained that she "was just in a cash crunch, so * * * [she] went to a friend and that she's just been a confidant of mine for a while".  The friend she went to was Sharon Sumter, the sole owner of Hajan Enterprises, Inc.  At trial Ms. Sumter credibly corroborated Mrs. Bennett's testimony and explained that "Jill [Mrs. Bennett] and I are friends, and she needed money and I gave it to her." Although the loans were made without interest, without a promissory note, and without any formalities, Ms. Sumpter still expects to be paid back.

Respondent failed to introduce evidence that these funds were in fact income or were related to any goods or services Mrs. Bennett or her husband provided to Hajan Enterprises, Inc., or Ms. Sumpter.  We consequently determine that the preponderance of the evidence corroborates Mrs. Bennett's testimony and supports petitioners' contention that the $85,000 from Hajan Enterprises, Inc., was a loan or perhaps a gift from Ms. Sumter and, therefore, not includable in petitioners' income.

VI.  Unreported Income of $47,069

Through the specific items method, respondent determined that for 2002 Mr. Bennett did not report income of $47,069.  Because respondent has introduced

sufficient evidence connecting petitioners with the unreported income, he is entitled to the presumption of correctness. Mr. Bennett and Mr. Hookfin each explained that petitioners reported their income on a gross basis and would try to estimate the amount of income that they had coming in. Petitioners did not present a schedule of how they arrived at the amounts of income reported on their returns nor did they present any evidence with respect to their income. Petitioners' failure to introduce evidence "which, if true, would be favorable to [them], gives rise to the presumption that if produced it would be unfavorable". Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947).

We are also not persuaded by petitioners' vague self-serving testimony implying that the amounts were included in the random number they chose to report on their return. See Page v. Commissioner, 58 F.3d 1342, 1346 (8th Cir. 1995), aff'g T.C. Memo. 1993-398; Schneebalg v. Commissioner, T.C. Memo. 1988-563. Petitioners never explained or itemized the amounts included on the Federal tax return or showed that the $47,069 was included in the reported income. Petitioners had the burden of establishing that the $47,069 was included in their income for

2002 or was a loan and they failed to do either; therefore, petitioners are liable for the income tax deficiency on the $47,069 for the 2002 tax year.

The Court has considered all of petitioners' and respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.