T.C. Memo. 2016-7

UNITED STATES TAX COURT

JEFFREY J. EVANS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24146-12.                    Filed January 11, 2016.

<u>Steve Ray Mather</u>, for petitioner.

<u>Vladislav M. Rozenzhak</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The respondent in this case (the "IRS") issued a notice of deficiency to the petitioner, Jeffrey J. Evans, for tax year 2009.  The IRS made the following determinations in its notice:

[*2]  •        income-tax deficiency of $372,457,[1]

       •        addition to tax under section 6651(a)(1)[2] of $83,146,

       •        addition to tax under section 6651(a)(2) of $44,344, and

       •        addition to tax under section 6654(a) of $8,840.

Evans timely filed a petition under section 6213(a).  We have jurisdiction under section 6214.  Evans resided in California at the time he filed his petition.[3] The parties have since made several concessions.  To resolve the remaining issues, the Court makes the following determinations:

---

[1]All dollar amounts have been rounded to the nearest dollar.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue.

[3]Therefore, an appeal of our decision in this case would go to the U.S. Court of Appeals for the Ninth Circuit unless the parties designate another circuit.  See sec. 7482(b)(1) and (2).

**[*3]**

| Part of Opinion | Determination |
|---|---|
| 1.a | The loss from the sale of Evans's property in Newport Beach, California (the "Newport Beach property") was deductible for tax year 2008. |
| 1.b | The loss from the sale of the Newport Beach property was a capital loss. |
| 1.c | As a capital loss sustained in 2008, the loss from the sale of the Newport Beach property has no effect on Evans's 2009 tax liability. |
| 2 | Even if the sale of the Newport Beach property produced an ordinary loss in 2008, the loss would have no effect on Evan's 2009 tax liability. |
| 3 | Evans's basis in the Newport Beach property is $1,400,000. |
| 4 | Evans is liable for additions to tax for 2009 under section 6651(a)(1) and (2) but not under section 6654(a). |

FINDINGS OF FACT

Evans's personal real-estate activities and the Newport Beach property

Evans has worked in the field of real-estate construction and development since he graduated from college in 1973. For most of that period, he worked for firms that oversaw the construction of large high-rise buildings. As an employee of these firms, Evans was responsible for managing the architects, design teams, and other contractors that the firms hired for various development projects. Since

[*4] 2002, he has been a full-time employee of Athens Group, a real-estate-development firm. He has performed the same type of work for Athens Group as he had for his previous employers.

Apart from his full-time job at Athens Group, Evans purchased for himself residential real-estate properties (the exact number of which is not revealed by the record) that he hoped to either develop for sale or rent to tenants. Evans's plan when purchasing properties for development and sale was to tear down the existing structures, construct single or multiunit residences, then sell those residences for gain. His alternative objective was to generate income by renting these residences to tenants. The types of tasks that Evans performed with respect to his personal real-estate projects included looking for properties to purchase, hiring architects, hiring contractors, and obtaining permits. Evans hoped that he would eventually be successful enough in his personal real-estate projects to pursue these projects full time. He also hoped that his personal real-estate projects would provide a source of retirement income and/or savings.

From 2003 through 2007, Evans considered buying several properties in California. Some of the properties Evans considered buying he would have torn down to develop and sell; others he intended to rent. During that four-year period,

[*5] he bought one rental property in Corona del Mar, California.[4]  During that same period, Evans bought two tear-down properties:  one in Corona del Mar[5] and the Newport Beach property.[6]  Over the course of three years, Evans developed the tear-down property in Corona del Mar into a two-condominium building, then sold it.  He bought the Newport Beach property on June 26, 2006.  The Newport Beach property was a plot of land which included a shack and a garage.  The shack and the garage were vacant at the time Evans acquired the property.  He intended to tear down the shack and the garage and build a two-unit house.  If Evans was unable to sell the units, he planned to retain the property and rent them.

Evans paid $1,400,000 in cash for the Newport Beach property.  To cover some of the purchase price, he liquidated some of his family's assets; he paid the rest of the purchase price using the proceeds of a loan of approximately $150,000.

While he owned the Newport Beach property, Evans incurred costs to prepare the property for development.  He paid an architect for drawings of the two-unit house that he intended to build there.  Evans paid other individuals for

---

[4]We refer to this property as the "rental property in Corona del Mar".  The record does not reveal the street address of this property.

[5]We refer to this Corona del Mar property as the "tear-down property in Corona del Mar".  The street address of this property is 507 Goldenrod.

[6]The street address of the Newport Beach property is 500 31st Street.

[*6] electrical and mechanical plans.  He incurred additional costs for permits, property taxes, and interest.

Some basic information about the three properties Evans purchased during the 2003 through 2007 period is summarized below:

Properties purchased by Evans

| Property | Date purchased | Date sold | Type of property (tear-down or rental) |
|---|---|---|---|
| Property in Corona del Mar, Cal. (street address unknown) | Sometime in 2003-07 | Not sold | Rental |
| 507 Goldenrod, Corona Del Mar, Cal. | Sometime in 2003-07 | Unknown (sold after Evans constructed two-unit condominium) | Tear-down |
| 500 31st St., Newport Beach, Cal. | June 26, 2007 | Oct. 30, 2008 (sold in fore-closure sale) | Tear-down |

In 2007, Evans's daughter was shot and killed by a police officer.  Her death caused Evans to suffer emotional distress, for which he received counseling.

Around May 2007, Evans borrowed $250,000 from Nelson Shayer and the Michael Slater Family Trust.  We refer to Shayer and the Michael Slater Family Trust collectively as "Shayer".  As part of the loan agreement, Shayer acquired a lien on the Newport Beach property.  At some point thereafter Evans defaulted on

[*7] the loan from Shayer, and Shayer foreclosed on the Newport Beach property. On October 30, 2008, the Newport Beach property was sold in a nonjudicial foreclosure sale for $556,000.  As of the end of 2008, Evans knew that the foreclosure sale had occurred; and although he did not know whether he was entitled to receive proceeds from the sale, he could have found out if he had inquired.

Of the $556,000 in foreclosure proceeds from the Newport Beach property, $250,000 was paid to satisfy Evans's debt to Shayer.  Evans learned in January 2009 that there were proceeds that were distributable to him.  On January 28, 2009, Evans wrote a letter to the trustee who oversaw the foreclosure sale, formally requesting that the excess proceeds from the Newport Beach property be distributed to him.  Thereafter, Evans and the trustee executed an agreement entitled "Release, Discharge, and Indemnity Agreement", which provided that the trustee was to distribute proceeds from the foreclosure sale to Evans, and that Evans, in return, would discharge the trustee from any claims Evans may have had with respect to the distribution of funds for the Newport Beach property.  On February 2, 2009, the trustee issued a check to Evans for $280,325.

**[*8]** <u>Returns and procedural history</u>

Evans's 2009 federal-income-tax return was due on April 15, 2010.

Evans did not file timely tax returns for tax year 2008 or 2009.

In 2012, Evans and his wife prepared and mailed to the IRS a Form 1040, U.S. Individual Income Tax Return, for tax year 2008.[7] Attached to the 2008 return was a Schedule C, Profit or Loss From Business, on which the couple reported income and expenses associated with Evans's dealings in real estate. On the Schedule C, the couple reported--as an inventory loss--$1,041,330 from the foreclosure sale of the Newport Beach property. The $1,041,330 loss was equal to the $1,597,330 they reported as their basis in the Newport Beach property minus the $556,000 that they reported as sale proceeds. The total business loss reported on the Schedule C was also $1,041,330. This is because the Evanses did not report that they had any business income or losses, other than the loss from the foreclosure sale. The couple reported a net-operating loss (or "NOL") for 2008 of $941,548. The return stated that the Evanses elected not to carry back the NOL to

---

[7]The only copy of the return in the record is undated, and the record does not otherwise reveal when in 2012 the return was prepared or sent. Evans credibly testified that he signed the 2008 return and that it was sent to the IRS in 2012. On the basis of this testimony, the IRS's transcript of account, and the fact that Evans introduced a copy of the return, even though the copy is unsigned, we find that the return was sent to the IRS and that it was sent sometime in 2012.

[*9] 2006 and 2007.  The Evanses reported that they had an available NOL

carryover of $941,548.  The return reported a tax liability of zero for 2008.

On April 9, 2012, the IRS prepared a substitute for return for Evans's 2009

tax year.  See sec. 6020(b).  Also on April 9, 2012, the IRS sent a letter to Evans

stating it had not received his 2009 federal-income-tax return.

Later in April 2012 Evans mailed to the IRS, and on April 27, 2012, the IRS

received, a Form 1040 from Evans and his wife for the 2009 tax year.[8]  On it, the

couple reported that they had an NOL for 2009 of $941,548 that would carry over

to subsequent years.  The couple reported that Evans had wage income of

$388,333.  They reported a net long-term capital gain of $33,858.  As a separate

matter they reported a $37 loss on the sale of farmland (later referred to in the

stipulation of settled issues as the Iowa farmland), an amount based on a reported

gross sale price of $700,000 and a reported adjusted cost basis of $700,037.  The

Evanses reported that they owed $75,720 in taxes.

In 2012, the Evanses prepared and mailed a Form 1040X, Amended U.S.

Individual Income Tax Return, for tax year 2008.[9]  The copy of the amended

---

[8]The 2009 return is dated April 11, 2012.

[9]The only copy in the record of the Evanses' Form 1040X for 2008 is not
signed or dated.  However, Evans credibly testified that he signed the 2008

(continued...)

**[\*10]** return in the record is not dated. On the amended return, the Evanses

provided the following reason for amending their original 2008 return:

> Election to relinquish entire carryback period for the 2008 NOL was entered on the originally filed 2008 Form 1040. We are filing an amended 2008 return to correct this by carrying back the NOL to 2006 and 2007 before we carry forward any remaining NOL to 2009.

The amended return did not alter the $941,548 NOL amount. Attached to the

amended return was a Form 1045, Application for Tentative Refund. On the form,

the couple reported that the $941,548 NOL resulted in an NOL carryback

deduction of $142,759 for 2006 and an NOL carryback deduction of $282,228 for

2007. After applying these NOL carryback deductions, the Evanses reported that

they had a remaining NOL carryover of $516,561.

---

[9](...continued)
amended return and that it was sent to the IRS in 2012. On the basis of this testimony and the fact that Evans introduced a copy of the return, even though the copy is unsigned, we find that there was such a return, that the Evanses signed the return, and that it was sent to the IRS sometime in 2012.

[*11] The returns for 2008 and 2009 are summarized below:

| Year | Type of return (i.e., joint or single; substitute for return) | Date filed | Reporting of NOL |
|------|---------------------------------------------------------------|------------|------------------|
| 2008 | Joint return | 2012 | • $941,548 NOL for 2008<br>• Purports to elect to waive carryback to 2006 and 2007<br>• NOL carryover of $941,548 to years later than 2008 |
| 2009 | Substitute for return (for Evans) | Apr. 9, 2012 | None |
| 2009 | Joint return | April 2012 | • $941,548 NOL carryover deduction |
| 2008 | Amended joint return | 2012 | • Purports to relinquish purported election to waive NOL carryback<br>• $516,561 NOL carryover to 2009 |

On July 9, 2012, the IRS issued the notice of deficiency for tax year 2009 to Evans. The IRS issued the notice shortly after receiving the Evanses' 2009 return; however, in preparing the notice, the IRS did not take their return into account. The computations of Evans's tax liability in the notice of deficiency were the same as the computations in the substitute for return that the IRS prepared for Evans on April 9, 2012. In the notice of deficiency, the IRS determined that Evans had $388,333 in compensation and $747,656 in short-term capital gain. The $747,656

[*12] short-term capital gain adjustment relates to the sale of farmland (later identified as Iowa farmland in the stipulation of settled issues). The notice does not mention (or incorporate into its calculations of Evans's 2009 tax liability) the loss attributable to the sale of the Newport Beach property or an NOL carryover deduction. The notice determined that Evans owed $369,537 in tax. The notice also made computational adjustments and determined additions to tax under section 6651(a)(1) and (2) and section 6654(a).

Evans timely filed a petition with the Tax Court. Evans's petition does not assert that he is entitled to a deduction for 2009 for the foreclosure sale of the Newport Beach property, through an NOL carryover, a capital-loss carry forward, or otherwise.

Before trial, the parties settled some issues relating to Evans's 2009 tax year. The parties stipulated that Evans received $700,000 from the sale of Iowa farmland and that his basis was $479,700. Evans conceded that he had $33,858 in capital gain for 2009 (gain which was unrelated to the Iowa farmland or the foreclosure sale of the Newport Beach property). The IRS conceded that Evans incurred several losses, none of which are related to the foreclosure sale of the Newport Beach property.

[*13] As reflected in his pretrial memorandum, Evans's position before trial with respect to the loss from the foreclosure sale of the Newport Beach property was: (1) the foreclosure sale resulted in an ordinary loss for 2008, (2) assuming an ordinary loss from the foreclosure sale in 2008, Evans had an NOL of $941,548 for tax year 2008, (3) Evans is permitted to carry over this NOL of $941,548 and apply it as a deduction against his 2009 income.[10] Between the filing of his pretrial memorandum two weeks before trial and the actual trial date, Evans found evidence that he contends shows that the loss resulting from the foreclosure sale was sustained in 2009, not 2008. On the basis of this new evidence, Evans has asserted an alternative theory, that the loss from the foreclosure sale was sustained in 2009, giving rise to an ordinary loss for 2009.

The case was tried on May 12, 2014, in Los Angeles, California. The evidence adduced at trial related to the tax consequences for Evans of the foreclosure sale of the Newport Beach property and whether he is liable for the additions to tax determined in the notice of deficiency. The parties filed posttrial briefs.

---

[10]This position is consistent with the original 2008 return and with the 2009 return but is inconsistent with the Evanses' amended return for 2008, on which they applied NOL carryback deductions for tax years 2006 and 2007. After the NOL carryback deductions were used, the amended return for 2008 reported that the Evanses had an NOL carryover of $516,561 available for 2009.

**[*14]**                                  OPINION

As explained above, Evans's primary position is that the loss from the foreclosure sale of the Newport Beach property is ordinary and the loss was sustained in 2008, resulting in a NOL carryover to 2009. His alternative position is that the character of the loss is ordinary and the loss was sustained in 2009.

The IRS's position is that: (1) the character of the loss from the foreclosure sale of the Newport Beach property is capital and (2) the loss was sustained in 2008.

The parties' positions are summarized in the table below:

|              | Character of loss | |
| --- | --- | --- |
| Year of loss | Capital | Ordinary |
| 2008 | IRS's position | Evans's <u>primary</u> position |
| 2009 | N/A | Evans's <u>alternative</u> position |

The taxpayer generally bears the burden of proving that the IRS's determinations are incorrect. Tax Ct. R. Prac. & Proc. 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). The burden of proof is satisfied by a preponderance of the evidence. <u>Estate of Gilford v. Commissioner</u>, 88 T.C. 38, 51 (1987). The IRS contends that Evans has the burden of proof with respect to all issues related to his tax liability. Evans does not contest this. We hold that Evans

**[\*15]** has the burden of proof with respect to all issues related to his tax liability. We discuss the burden of proof regarding the imposition of additions to tax in further detail in part 4, infra pp. 41-53.

1. The loss from the sale of the Newport Beach property was deductible for 2008 and is a capital loss.

We agree with the IRS's position that the loss from the sale of the Newport Beach property was sustained in 2008, see part 1.a, infra pp. 15-22, and is a capital loss, see part 1.b, infra pp. 22-31. The loss has no effect on Evans's 2009 tax year. See part 1.c, infra pp. 31-32.

   a. The loss from the sale of the Newport Beach property was deductible for 2008.

The parties agree that the Newport Beach property was sold for a loss in a foreclosure sale on October 30, 2008, and that Evans received his share of the proceeds from the sale the following year. The parties disagree about the year for which the loss was deductible. The IRS contends that the loss was deductible for 2008--the year in which the foreclosure sale took place. Evans contends that the loss was deductible for 2009--the year in which Evans received his share of the proceeds from the sale.[11]

_____

[11]As noted supra p. 13, shortly before trial, Evans found evidence that he contends proves that the loss resulting from the foreclosure sale of the Newport

(continued...)

[*16] The parties agree that the legal authority for deducting the loss from the foreclosure sale is section 165.  Section 165 allows a deduction for any loss "sustained during the taxable year" and not compensated for by insurance or otherwise.  Sec. 165(a).[12]  Regulations under section 165 provide that a loss is treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year.  Sec. 1.165-1(d)(1), Income Tax Regs.  A loss resulting from a foreclosure sale is typically sustained in the year in which the property is disposed of and the debt is discharged (the debt being the debt secured by the

---

[11](...continued)
Beach property was sustained in 2009.  The IRS objects to this new theory because it learned of the theory only the Friday before trial (which occurred the following Monday).  Nonetheless, we permit Evans to assert the new theory (i.e., that the foreclosure sale gave rise to an ordinary loss that was sustained in 2009) as an alternative to his main theory (that he has an NOL carryover for 2009 based on the foreclosure sale's giving rise to an ordinary loss for 2008).  Our reasoning is that the new theory raises only one new fact issue--the timing of the loss--compared to his main theory.  The IRS is not prejudiced by Evans's giving the IRS such short notice of the new theory because, among other reasons, we kept the record open for 30 days following trial to allow the IRS to offer further evidence on the issue.

[12]Sec. 165(f) imposes the requirement that losses from the sale or exchange of capital assets are deductible under sec. 165(a) only to the extent allowed by secs. 1211 and 1212.  A foreclosure sale is a "sale" for federal-income-tax purposes.  Sec. 1001; Helvering v. Hammel, 311 U.S. 504, 512 (1941); R. O'Dell & Sons Co. v. Commissioner, 169 F.2d 247, 248 (3d Cir. 1948), aff'g 8 T.C. 1165 (1947).

[*17] property and satisfied--in full or in part--from the proceeds of the foreclosure sale). Eisenberg v. Commissioner, 78 T.C. 336, 344 (1982); see Commissioner v. Green, 126 F.2d 70, 71 (3d Cir. 1942); R. O'Dell & Sons Co. v. Commissioner, 8 T.C. 1165, 1168 (1947), aff'd 169 F.2d 247 (3d Cir. 1948). However, a foreclosure sale is not "final" so as to trigger the recognition of loss while the taxpayer-debtor retains a right of redemption (i.e., the right to reclaim property sold in the foreclosure sale) under state law or while there is ongoing litigation surrounding the foreclosure. See Eisenberg v. Commissioner, 78 T.C. at 344 (ongoing litigation); R. O'Dell & Sons Co. v. Commissioner, 8 T.C. at 1168 (right of redemption); Herwig v. Commissioner, T.C. Memo. 2014-95, at *16-*17 (ongoing litigation); Great Plains Gasification Assocs. v. Commissioner, T.C. Memo. 2006-276, 92 T.C.M. (CCH) 534, 546 (2006) (foreclosure and right of redemption).

For the following reasons, we conclude that the foreclosure of the Newport Beach property was final in 2008 and that Evans's loss was sustained in 2008. The Newport Beach property was sold in a nonjudicial foreclosure sale in 2008.[13]

---

[13]A creditor seeking to foreclose on a property may elect to foreclose using either judicial or nonjudicial procedures. See Rossberg v. Bank of Am., N.A., 162 Cal. Rptr. 3d 525, 534 (Ct. App. 2013). Cal. Civ. Code secs. 2924 through 2924k set forth a comprehensive framework regulating nonjudicial foreclosure sales. See

(continued...)

[*18] Under California law, a nonjudicial foreclosure sale generally constitutes a final adjudication of the rights of the debtor and the lender, and a debtor whose property is sold in a nonjudicial foreclosure sale has no right to redeem the foreclosed property. See Rossberg v. Bank of Am., N.A., 162 Cal. Rptr. 3d 525, 534 (Ct. App. 2013). Nothing in the record suggests that these general rules do not govern the foreclosure of the Newport Beach property. Thus, under operation of California law, the foreclosure of the Newport Beach property extinguished (1) Evans's legal obligation to Shayer and (2) Evans's legal rights in the Newport Beach property. Morever, there is no evidence indicating that any dispute existed concerning the amount that Evans owed Shayer or the amount of the foreclosure proceeds that would be used to satisfy Evans's debt to Shayer. Evans testified that, other than Shayer, he knew of no creditors who had liens on the Newport Beach property at the time of the foreclosure.[14]

---

[13](...continued)
id. In general, a nonjudicial foreclosure is less expensive and more quickly concluded than a judicial foreclosure since there is no oversight by a court. See id.; Jenkins v. J.P. Morgan Chase Bank, N.A., 156 Cal. Rptr. 3d 912 (Ct. App. 2013); 27 Cal. Jur. 3d, Deeds of Trust, sec. 258.

[14]Evans testified that he borrowed $150,000 to purchase the property but did not testify (or argue) that the loan was secured by the Newport Beach property or that the $150,000 was outstanding at the time the property was sold.

**[*19]** In support of his argument that the loss was not deductible until 2009, Evans cites Herwig v. Commissioner, T.C. Memo. 2014-95. In Herwig, the property in question was sold in a foreclosure in 2008; however, the borrower (the taxpayer) and the lender were still in litigation concerning the foreclosure at the close of that year. Id. at *16. The Court observed that in light of the "uncertainties inherent in the ongoing litigation * * * a final accounting of the gain or loss realized * * * and recognition of any gain or loss for tax purposes * * * could not be determined in 2008 [the year of the foreclosure]." Id. No such uncertainty existed here. In support of his argument to the contrary, Evans points to the fact that in January 2009 he signed an agreement to release the trustee who conducted the foreclosure sale from claims surrounding the foreclosure in exchange for the trustee's distribution to Evans of proceeds remaining from the foreclosure.[15] However, the trustee was obligated, under California law, to

_____

[15]The IRS objected to admission of the agreement on several grounds. At trial, we determined that all but two of its grounds for objection were without merit; we reserved judgment on these two grounds. These two grounds were: (1) Evans did not timely exchange a copy of the agreement with IRS counsel and (2) relevancy (i.e., Evans did not plead the issue of the timing of the loss and that the agreement is relevant only to this issue). In its posttrial brief the IRS argued its objection on the basis of untimely exchange but not relevancy. Evans's failure to timely exchange the agreement did not prejudice the IRS, and we find the IRS's objection on that basis to be without merit. We consider the IRS to have waived its objection on relevancy grounds because it did not assert the objection on brief.

(continued...)

[*20] distribute those funds to Evans. See Cal. Civ. Code sec. 2924j (West 2012); Miller and Starr, California Real Estate, 4 Cal. Real Est. sec. 10:257 (3d ed. 2013). The mere fact that the trustee continued to hold those funds through 2008 and paid them after receiving a release from Evans does not show that there was any dispute about whether the proceeds were distributable to Evans or the amount of proceeds so distributable.

Because the loss from the foreclosure sale was sustained in 2008, the loss was deductible for 2008. See sec. 165(a).

Evans argues, however, that because he was a cash-method taxpayer and did not receive (or have notice of) the proceeds from the sale until 2009, the loss did not become deductible until 2009. The taxpayer's method of accounting determines the year for which a taxpayer must include the amount of an item of gross income, sec. 451(a), or the amount of any deduction, sec. 461(a). The taxpayer's method of accounting is the method by which the taxpayer regularly computes income in keeping books. Sec. 1.446-1(a), Income Tax Regs. One permissible method of accounting is the cash method of accounting. Id. para. (c)(1)(i). Under the cash method of accounting, items of gross income are

---

[15](...continued)
Furthermore, as we explained supra note 11, we permit Evans to assert the timing issue.

[*21] included for the tax year in which the taxpayer actually (or constructively) received the income.  Id.  Income is constructively received in the taxable year in which (1) it is "credited" to the taxpayer's "account", (2) "set apart" for the taxpayer, or (3) "otherwise made available" so that (a) the taxpayer "may draw upon it at any time," or (b) so that the taxpayer "could have drawn upon it during the taxable year if notice of intention to withdraw had been given."  Sec. 1.451-2(a), Income Tax Regs.  However, "income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions."  Id.

Under the cash method of accounting, amounts representing deductions are deducted (or otherwise taken into account) for the year paid.  Sec. 1.461-1(a)(1), Income Tax Regs.  However, if the deduction does not entail a cash disbursement (because, for example, it is a loss deduction under section 165 or a depreciation deduction under section 167), the deduction year is based on separate timing rules.  See Kilborn v. Commissioner, 29 T.C. 102, 110 (1957) ("Under the statute, losses are deductible in the year sustained * * * whether a taxpayer is on a cash basis or an accrual method of accounting."), aff'd in part, rev'd in part, 1958 WL10182 (5th Cir. Sept. 18, 1958); see also sec. 1.461-1(a)(1), Income Tax Regs.; Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates & Gifts, para.

**[\*22]** 105.3.4, at 105-70 (3d ed. 2012). The timing of loss deductions is governed by section 165(a) and the regulations thereunder. See secs. 1.165-1(d)(1), 1.461-1(a)(1), Income Tax Regs.

Evans has cited no authority, and we have found no authority, to support the proposition that a loss from a sale is not deductible until proceeds from the sale are received by the taxpayer or the taxpayer is notified that proceeds are distributable to him or her. We conclude that the loss was sustained (and deductible) regardless of the year in which Evans received proceeds from the sale or received notice that such proceeds were available to him.

      b.     The loss from the sale of the Newport Beach property was a capital loss.

The parties agree that Evans sustained a loss as a result of the foreclosure of the Newport Beach property but disagree on how the loss should be characterized for federal income-tax purposes. Evans contends that the loss is ordinary while the IRS contends that the loss is capital. To determine the character of the loss, we must determine whether the Newport Beach property is a capital asset. See sec. 1221; Ark. Best Corp. v. Commissioner, 485 U.S. 212, 223 (1988). The question of whether the Newport Beach property is a capital asset is a question of fact. See

[*23] Austin v. Commissioner, 263 F.2d 460, 461 (9th Cir. 1959), rev'g T.C. Memo. 1958-71.

A capital asset is defined by section 1221(a) as any "property held by the taxpayer", but under section 1221(a)(1), a capital asset does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."[16]  The Court of Appeals for the Ninth Circuit, the venue for an appeal of this case unless the parties designate another circuit, see sec. 7482(b)(2), considers several factors to determine whether property is held primarily for sale to customers in the ordinary course of the taxpayer's trade or business, Redwood Empire Sav. & Loan Ass'n v. Commissioner, 628 F.2d 516, 517 (9th Cir. 1980), aff'g 68 T.C. 960 (1977).  These factors include:  (1) the nature of the acquisition of the property, (2) the frequency and continuity of property sales over an extended period, (3) the nature and extent of the taxpayer's business, (4) "the activity of the seller [i.e., the taxpayer] about the property," and (5) the extent and substantiality of the taxpayer's transactions.  See id.; Pool v. Commissioner, T.C.

---

[16]Sec. 1221(a)(1) also excludes from the definition of a capital asset "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year".  Neither party ascribes special or independent significance to the statutory exception's reference to both inventory property and resale property; and therefore we do not analyze whether the Newport Beach property is inventory separate from the question of whether it is resale property.

[*24] Memo. 2014, at *9.  In applying these factors we decide each case upon its particular facts, and the presence of any one or more of these factors may or may not be determinative.  Redwood Empire Sav. & Loan Ass'n v. Commissioner, 628 F.2d at 517.  Facts showing that the taxpayer operated a trade or business and held the property in question primarily for sale as part of that trade or business are required for a determination that the property in question is not a capital asset.  See sec. 1221(a)(1).

The IRS does not appear to dispute that Evans held the Newport Beach property primarily for sale.  The IRS's argument that the Newport Beach property is a capital asset hinges on the premise that Evans's personal real-estate development activities do not constitute a trade or business.  If this premise is correct, even if Evans held the Newport Beach property primarily for sale, it is a capital asset because he did not hold it primarily for sale to "customers in the ordinary course of his trade or business".  Id.; see Buono v. Commissioner, 74 T.C. 187, 199-200 (1980) ("Satisfying the 'held for sale to customers' requirement of section 1221(1) does not resolve the issue at hand.  We must also determine whether [the taxpayer's] activities constituted a trade or business since the sale * * * must have been made in the ordinary course thereof.").

**[\*25]**  i.  <u>The nature of the acquisition of the property</u>

This factor concerns the taxpayer's objective in acquiring the property in question.  See, e.g., <u>Pool v. Commissioner</u>, at \*9; <u>Bennett v. Commissioner</u>, T.C. Memo. 2012-193, 104 T.C.M. (CCH) 41, 44 (2012).  Before deciding to purchase the Newport Beach property, Evans considered purchasing several properties on which he would have torn down existing structures and constructed new ones.  Evans's principal objective in acquiring the Newport Beach property was to tear down the existing structures, build a two-unit home, and sell the property for a gain.  If Evans was unable to obtain a desirable sale price for the property, he planned to hold the property and rent it to tenants.  In order to develop the property, Evans planned to (and did) work with contractors, such as an architect and an electrician.  These facts indicate that, at the time he purchased the Newport Beach property, Evans's main intention was to tear down existing structures and develop and sell the property.  However, even if Evans acquired the Newport Beach property with the intention of developing it, this does not mean that he was in the business of property development and sale.  See <u>Buono v. Commissioner</u>, 74 T.C. at 199-200.  Therefore this intention does not dispose of the question of whether Evans held the Newport Beach property as part of a business of developing and selling properties to customers.

**[\*26]**      ii.      <u>The frequency and continuity of property sales over an extended period</u>

Facts indicating that the taxpayer engages in regular (rather than isolated or sporadic) sales of property support a finding that he or she is engaged in a trade or business. See <u>Pool v. Commissioner</u>, 251 F.2d 233, 237 (9th Cir. 1957), <u>aff'g</u> T.C. Memo. 1956-64. Evans testified summarily that he began acquiring properties as early as 1980 and had acquired multiple properties since that time. However, he supplied us with few details about these properties. He estimated that he had invested in a total of eight or nine properties, some of which he planned to rent to tenants and some of which he planned to develop and sell. Apart from the Newport Beach property, Evans specifically identified only two properties he had previously acquired. One was the rental property in Corona del Mar, California. The other was the tear-down property in Corona del Mar. Evans developed the tear-down property in Corona del Mar into a two-unit condominium, then sold it. The Newport Beach property was sold in a foreclosure sale. Evans's testimony about other properties he may have acquired for development and sale was too vague to be reliable. The limited record shows that Evans's property sales were sporadic, not frequent and continuous. See, e.g., <u>Buono v. Commissioner</u>, 74 T.C. at 200; <u>Phelan v. Commissioner</u>, T.C. Memo. 2004-206, slip op. at 21-22 ("[T]wo

**[\*27]** sales of real property by * * * [the taxpayer] in 4 years were of insufficient

frequency to support the conclusion that * * * [the taxpayer]'s sales were in the

ordinary course of its business.").

### iii. The nature and extent of the taxpayer's business

Evans was actively involved in developing the tear-down property in

Corona del Mar and the Newport Beach property. He hired and managed

contractors and dealt with permit issues. In addition to the time he spent

developing these two properties, he actively sought new properties to acquire and

develop. These activities notwithstanding, the record indicates that Evans held

only a few properties for development and sale and that he acquired the properties

sporadically. From this we conclude that Evans's personal real-estate

development activities were each rather isolated.[17]

---

[17]During all relevant times, Evans worked for Athens Group, a real-estate-development company that specializes in large-scale real-estate projects. The tasks Evans performed at that job (for example, hiring and overseeing contractors) were similar to tasks that he performed with respect to his own properties. Evans argues that his work as an employee of Athens Group should be treated as part of the same business as his personal real-estate development projects. We disagree. Evans's personal development projects are distinct from his employer's business of large-scale real-estate development. See Buono v. Commissioner, 74 T.C. 187, 206 (1980) ("[T]he fact that a taxpayer is a broker does not require a determination that he is in the business of buying and selling real estate for his own account (in other words, a dealer)."); Ayling v. Commissioner, 32 T.C. 704, 709 (1959) ("[Petitioner's] occupation as an employee was obviously not the same as dealing

(continued...)

[*28] Additionally, we note that Evans supplied very few records related to his personal real-estate transactions, and his testimony concerning his properties was notably vague. One generally expects that a person who considers himself or herself in business will maintain books and records for that business. See, e.g., Norris v. Commissioner, T.C. Memo. 1991-648, 62 T.C.M. (CCH) 1652, 1656 (1991). A party who wishes to prove to the court that he kept records may convince the court of the truth of that assertion by testifying that he kept records or by introducing actual records into evidence. Evans did neither. His failure to testify about his recordkeeping or to introduce his records, combined with the vagueness of his testimony about his properties, indicates to us that Evans did not maintain records of his personal real-estate-development activities. These circumstances suggest that Evans's personal real-estate development activities did not constitute a trade or business. See, e.g., id. 62 T.C.M. (CCH) at 1656 (finding no trade or business existed where "[p]etitioner made no showing as to the details of the operation of his real estate activities or the profitability of those activities, and he did not present evidence that he conducted his real estate activities in a systematic and businesslike manner").

_____

[17](...continued)
in real estate on his own account.").

**[\*29]**       iv.       <u>The activity of the seller about the property</u>

This factor relates to the steps that the taxpayer undertook to sell the property.  See, e.g., <u>Bennett v. Commissioner</u>, 104 T.C.M. (CCH) at 44.  The Newport Beach property was sold in a foreclosure sale in 2008.  This does not detract from the fact that Evans intended to sell the property.  However, this intention does not answer the question of whether Evans was in the business of selling property.  Cf. <u>Buono v. Commissioner</u>, 74 T.C. at 200 (involuntary sale of properties by taxpayer was not significant in determining whether taxpayer's transactions were frequent and substantial).

                    v.       <u>The extent and substantiality of transactions</u>

As discussed <u>supra</u>, Evans testified that he had acquired several properties.  However, he specifically identified only three properties he had acquired:  (1) the rental property in Corona del Mar, California, (2) the tear-down property in Corona del Mar (which he acquired for development and sale), and (3) the Newport Beach property (which he acquired to rent or to develop and sell).  Evans testified that he developed and sold a two-unit condominium on the tear-down property in Corona del Mar, but he did not indicate in his testimony whether the sale generated income.  The Newport Beach property was sold at a loss in a foreclosure sale.  Thus, of the two properties that Evans identified and that were

[*30] potentially held for development and sale, only one may have produced any income. We surmise that Evans's primary source of income was his full-time job at Athens Group and that any income he may have earned from developing properties accounted for an insubstantial portion of his income. Cf. Gamble v. Commissioner, 242 F.2d 586, 591-592 (5th Cir. 1957), aff'g T.C. Memo. 1955-289.

Our analysis of the foregoing factors leads us to conclude that Evans's personal real-estate-development activities did not constitute a trade or business for purposes of section 1221(a)(1) and that therefore the Newport Beach property was a capital asset.[18] Consequently, we conclude that the loss he incurred upon

_____

[18]Evans argues for the first time in his opening brief that, if the Newport Beach property does not fall within the scope of sec. 1221(a)(1), it still should not be treated as a capital asset for purposes of characterizing his loss because it was held as part of the trade or business of renting properties. See secs. 1221(a)(2), 1231(a) and (b)(1); Cottle v. Commissioner, 89 T.C. 467, 484, 490 (1987). We disagree with the premise that Evans was in the rental business and that he held the Newport Beach property as part of his rental business. Evans did not hold any rental properties during the relevant period and intended to rent the Newport Beach property only if he could not sell it. At no point did he undertake steps to rent the property. These facts, viewed in conjunction with the entire record, reveal both that Evans was not in the trade or business of renting property and that the Newport Beach property was not held as a rental property. See Cottle v. Commissioner, 89 T.C. at 484. (The IRS contends that we should not consider Evans's sec.-1231 theory because the IRS did not have notice that Evans would raise it. See generally DiLeo v. Commissioner, 96 T.C. 858, 891 (1991), aff'd 959 F.2d 16 (2d Cir. 1992). The record does not support Evans's sec.-1231 theory.

(continued...)

[*31] the foreclosure sale of the Newport Beach property was a capital loss. See, e.g., Fed. Bulk Carriers, Inc. v. Commissioner, 66 T.C. 283, 295 (1976), aff'd, 558 F.2d 128 (2d Cir. 1977); Tenn. Egg Co. v. Commissioner, 47 B.T.A. 558, 560 (1942); MacAdam v. Commissioner, T.C. Memo. 1991-410, 62 T.C.M. (CCH) 565, 569 (1991).

     c.     As a capital loss sustained in 2008, the loss from the sale of the Newport Beach property has no effect on Evans's 2009 tax liability.

We now consider the effect on Evans's tax liability if, as we have held, the foreclosure loss was a capital loss in 2008 resulting in a deduction for 2008. A capital loss in 2008 could theoretically affect Evans's 2009 tax liability through two mechanisms: (1) if it were carried forward to 2009 as a capital-loss carryforward, see sec. 1212(b), or (2) if it were carried forward to 2009 as an NOL carryover, see sec. 172(c), (d)(2). Evans has not contended, in the event the foreclosure loss is considered a capital loss for 2008, that either of these two mechanisms would reduce his 2009 tax liability. Thus we decline to consider whether either mechanism so reduced it.

---

[18](...continued)
We therefore need not resolve the IRS's contention that Evans should be barred from raising that theory.)

**[*32]** We conclude that the foreclosure loss has no effect on Evans's tax liability for 2009. Because 2009 is the only tax year at issue in this case, we need not make any further findings or reach any further holdings regarding the foreclosure loss. Nonetheless, as explained below, we consider the tax consequences if the foreclosure loss is an ordinary loss (for 2008), see part 2, infra pp. 32-35, and we also consider Evans's basis in the Newport Beach property, see part 3, infra pp. 36-41.

2.     <u>Even if the sale of the Newport Beach property produced an ordinary loss in 2008, the loss would have no effect on Evans's 2009 tax liability.</u>

Besides his alternative argument that the loss from the foreclosure of the Newport Beach property was an ordinary loss for 2009 (an argument we reject because we determine that the loss is a capital loss for 2008), Evans's primary position is that the sale of the Newport Beach property produced an ordinary loss for 2008 and that an NOL resulting from the loss is carried forward as a deduction for 2009. Although we hold that the sale of the Newport Beach property produced a capital loss, we nonetheless consider Evans's primary argument assuming (counterfactually, in our view) that the character of the loss is ordinary. As we explain below, even if we assume that the loss is ordinary, it has no effect on

[*33] Evans's 2009 tax liability. Thus, even if our conclusion about the loss being a capital loss was incorrect, the loss would not affect the deficiency for 2009.

An NOL is the excess of the taxpayer's allowable deductions over gross income for a given tax year (the "NOL year"). Sec. 172(c). Section 172(a) allows an NOL deduction for a taxable year in an amount equal to the sum of the NOL carrybacks and NOL carryovers available for that year. Section 172(b)(2) establishes the manner in which an NOL is carried back and forward from the year in which it was incurred. In general, an NOL is required to be carried back to the earliest available year of the carryback period and then (to the extent not absorbed) to be carried over successively to the next year, or years, all the way through the remainder of the carryback period and the full carryover period until completely absorbed.[19] Id. The carryback period is the two years preceding the NOL year.

---

[19]The amount absorbed for each year to which the NOL is carried is not necessarily the amount of the NOL that was used as a deduction for each such year. Plumb v. Commissioner, 97 T.C. 632, 638 n.5 (1991). Sec. 172(b)(2) provides that after being carried to the earliest available year, the portion of the NOL remaining to be "carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried." Moreover, the "taxable income" for any such prior year is to be computed with certain modifications. Id. When we refer to the amount of the NOL as being absorbed for a particular year, we do so for convenience as a shorthand expression for the amount thus extinguished for that year pursuant to sec. 172(b)(2), rather than the amount that was actually used as the NOL deduction or part thereof for that year.

[*34] Sec. 172(b)(1)(A)(i). Under section 172(b)(3), a taxpayer may elect to relinquish the carryback period with respect to an NOL for a given year. An election under section 172(b)(3) is irrevocable and applies to all of the carryback years relating to the NOL year for which the election is made. Sec. 172(b)(3)(C). If the taxpayer so elects, he or she does not carry back the NOL to any year in the carryback period, and no part of the loss is allowed as a deduction for any year in that period. Plumb v. Commissioner, 97 T.C. 632, 636 (1991). Accordingly, no part of the NOL is absorbed by taxable income in the carryback period. Id. The entire NOL is instead carried forward to the earliest year in the carryover period. Sec. 172(b)(2). The carryover period is the 20 years after the NOL year. Sec. 172(b)(1)(A)(ii). To be entitled to an NOL carryback or carryover deduction for a particular year, the taxpayer must prove: (1) the amount of the NOL in the NOL year and (2) the amount of the NOL that was not fully absorbed (as an NOL carryback or carryover deduction) in the years preceding the particular year for which the taxpayer seeks the NOL deduction. Sec. 172(b)(2), (c); Jones v. Commissioner, 25 T.C. 1100, 1104 (1956), rev'd and remanded on other grounds, 259 F.2d 300 (5th Cir. 1958); see also Deutsch v. Commissioner, T.C. Memo. 2012-318, at *14; Taylor v. Commissioner, T.C. Memo. 2009-235, 98 T.C.M. (CCH) 342, 346 (2009).

**[\*35]** Evans has not satisfied his burden of proving that he is entitled to deduct an NOL carryover for 2009. He has not even attempted to prove that he had an NOL in 2008 or, if so, the amount thereof. To calculate his NOL in 2008, he would need to prove his gross income and deductions for 2008 (not just the deduction associated with the foreclosure sale). See sec. 172(c). Similarly, he has not attempted to prove his gross income and deductions for 2006 and 2007 and thus whether any 2008 NOL was used in these previous years.[20] See Jones v. Commissioner, 25 T.C. at 1104. Thus, even if Evans had proved that he had an NOL in 2008, we would be unable to determine how much of that NOL was absorbed for 2006 and 2007[21] and how much of the NOL remained available for tax year 2009 (as an NOL carryover deduction).

---

[20] Although Evans provided returns and amended returns for 2006, 2007, and 2008, the IRS disputes the accuracy of the returns. Under the circumstances, we consider Evans's prior year returns only as a statement of his litigating position, not as proof that his position is correct. See, e.g., Lawinger v. Commissioner, 103 T.C. 428, 438 (1994).

[21] Although Evans filed a Form 1040 for 2008 purporting to waive the carryback of the 2008 NOL to tax years 2006 and 2007, he filed the form in 2012, which was too late to waive the carryback. See sec. 172(b)(3); Diesel Performance, Inc. v. Commissioner, T.C. Memo. 1999-302, 16 F. App'x 718 (9th Cir. 2001).

**[*36]** 3.     <u>The basis of the Newport Beach property is $1,400,000</u>.

Because we hold that the loss from the foreclosure of the Newport Beach property was a capital loss sustained in 2008, <u>see</u> <u>supra</u> parts 1.a and 1.b, and we decline to consider the effect of the capital loss on Evans's 2009 tax liability through a capital loss carryforward or NOL carryover mechanism, <u>see</u> <u>supra</u> part 1.c, it is not necessary to determine Evans's basis in the Newport Beach property. His basis would be relevant to our decision in only two alternative scenarios, each of which is inconsistent with certain of the determinations we have made so far. The first scenario is that:

- the foreclosure loss was in 2008 (consistent with our holding in part 1.a);

- the loss is ordinary (contrary to our holding in part 1.b); and

- the loss created an NOL that carried over to 2009 as a deduction (contrary to our holding in part 2).

The second scenario is that:

- the foreclosure loss was in 2009 (contrary to our holding in part 1.a); and

- the foreclosure loss is ordinary (contrary to our holding in part 1.b).

**[\*37]** As noted above, it is necessary to determine Evans's basis in the Newport Beach property only in the event that certain of our determinations are incorrect. Nonetheless, neither party objected to trying the issue. We exercise our discretion to determine Evans's basis in the Newport Beach property.

A property's adjusted basis is equal to its cost, plus or minus the adjustments required by section 1016. See sec. 1011(a). One type of adjustment is to increase basis by the cost incurred to develop the property. See secs. 263A, 1016(a); sec. 1.263(a)-1(d)(2), Income Tax Regs. The taxpayer bears the burden of proving the cost. See Chandler v. Commissioner, 142 T.C. 279, 291 (2014). A court may estimate the cost (and the corresponding basis adjustment) if the taxpayer offers credible evidence that provides a factual ground for the estimate. Id.; see also Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

Evans purchased the Newport Beach property for $1,400,000. The IRS argues that the adjusted basis is equal to the $1,400,000 acquisition cost because, it contends, Evans has not demonstrated that any adjustments to basis are justified. Evans argues that his adjusted basis in the Newport Beach property is $1,597,330, which is equal to his $1,400,000 acquisition cost plus adjustments for various costs that Evans alleges he paid in connection with developing the property. At

[*38] trial, he testified about several of these costs.  We describe the evidence

regarding these costs below.

Evans testified that he paid an architect, George Bissell, who drew plans for

the units that Evans planned to build on the property.  At trial, the Court admitted

a letter dated July 17, 2008, that Bissell wrote to Evans.[22]  The letter stated, in

relevant part:  "I have written to the court[23] to let them know that payment has

been made and to dismiss the judgement."  The letter does not provide any further

detail about the payment (i.e., the amount of the payment, the identity of the payor,

or the identity of the payee) or the judgment.  Evans testified that the payment

described in the letter was a payment Evans made to Bissell in satisfaction of a

---

[22]At trial, the IRS objected to the admission of the letter on the grounds that Evans did not timely exchange the letter with the IRS.  At trial, we overruled the objection and admitted the letter into evidence.  In its posttrial brief the IRS (evidently under the mistaken belief that we reserved ruling on the admissibility of the letter) argued that we should exclude the letter from evidence:  "Respondent objected to the admission of petitioner's Exhibit * * * 14-P [the letter from Bissell].  The Court asked the parties to brief the relevancy and proper pleading objections."  But we had already admitted the letter into evidence at trial, thus overruling the IRS's objection.  The Court reserved ruling on the admissibility of other documents offered by Evans (and asked the parties to brief the Court on the admissibility of those documents), but the letter from Bissell was not one of those documents.  Issues regarding the admissibility of the other documents to which the IRS raised objections are addressed elsewhere in this opinion.  See supra note 15 and infra note 31.  The letter from Bissell remains in the record.

[23]The "court" referred to in the letter was not the Tax Court.

[*39] lien that Bissell once had on the Newport Beach property. Evans also testified that he paid Bissell between $25,000 and $35,000.

Evans testified about several other expenses he claimed that he incurred while developing the Newport Beach property. Evans testified that he paid approximately $15,000 to electrical and mechanical designers for drawings, approximately $7,000 for permits, and approximately $100,000 of interest on various loans he secured to finance the development of the property. In addition to these costs, he testified summarily that he paid taxes and that he made a payment to a realtor; but he did not estimate the amounts of these payments or provide any documentary evidence showing the amounts.

Finally, Evans testified that he paid $70,000, in addition to the $1,400,000 purchase price, when he closed on the Newport Beach property. This payment, according to Evans, was a penalty for his failure to close on the property by the date required by the sales agreement. In support of Evans's testimony that he made this payment, Evans introduced (and we admitted) into evidence a document entitled "Preliminary Change of Ownership Report".[24] Evans testified that the

---

[24]During trial Evans moved to have the report admitted into evidence, and we admitted it. The IRS did not object to its admission. In its posttrial brief the IRS asked that the report be excluded from evidence. We treat the IRS's failure to object to the admission of the report during trial as a waiver of its objection. See

(continued...)

**[\*40]** report showed that the final purchase price was $1,470,000, an amount that incorporated the $70,000 "penalty" that Evans incurred upon closing. However, the report states that the purchase price for the Newport Beach property was $1,400,000 and says nothing of a $70,000 penalty. Thus, the report does not support Evans's testimony that he incurred a $70,000 penalty upon closing. Evans did not introduce any corroborating documents, such as the underlying sales agreement, into evidence.

A court need not accept as true a taxpayer's self-serving testimony that he or she incurred costs that should be added to basis. See Millsap v. Commissioner, 46 T.C. 741, 760 (1966), aff'd, 387 F.2d 420 (8th Cir. 1968). Although we consider credible Evans's testimony that he incurred various costs, his vague, unsupported testimony as to the amounts does not give us a ground for estimating them.[25] See id. Evans offered no explanation for his failure to produce any supporting documentary evidence. See id. As a result of these shortcomings, we conclude

---

[24](...continued)
Fed. R. Evid. 103. We do not consider the IRS's untimely objection. The report remains in the record.

[25]The IRS did not dispute that the costs about which Evans testified were indeed the types of costs that, if proven as to amount, should be added to Evans's adjusted basis in the Newport Beach property. We need not and do not decide the question of whether the costs, if they are as Evans described, are the types of costs that should be added to adjusted basis.

**[\*41]** that Evans's basis in the Newport Beach property at the time it was sold in foreclosure was $1,400,000.

4.    Evans is liable for additions to tax for 2009 under section 6651(a)(1) and (2) but not section 6654(a).

The IRS bears the burden of production for any "addition to tax" determined under section 6651(a)(1) or (2) or section 6654(a).  See sec. 7491(c).  The IRS satisfies its burden of production by producing evidence sufficient to establish that it is appropriate to impose the additions to tax.  See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  If the IRS satisfies its burden of production, the taxpayer bears the burden of proving that the additions to tax are improper.  See id. at 447, 449.

    a.    Section-6651(a)(1) addition to tax for failure to file tax return

The IRS determined that Evans is liable for the section-6651(a)(1) addition to tax for failing to timely file a return for 2009.  Section 6651(a)(1) imposes an addition to tax for the failure to file a tax return by its filing deadline (determined by taking into account any extensions of the deadline) unless the taxpayer can establish that the failure to file is due to reasonable cause and not willful neglect.  The section-6651(a)(1) addition to tax is 5% of the amount required to be shown as tax on the return for each month the failure to file continues, not to exceed 25%

**[\*42]** in the aggregate. Sec. 6651(a)(1), (b)(1).[26] A substitute for return prepared by the IRS under section 6020(b) does not count as a return filed by the taxpayer for purposes of section 6651(a)(1). Sec. 6651(g)(1). The IRS satisfies its burden of production under section 7491(c) for the section-6651(a)(1) addition to tax by producing evidence sufficient to establish that the taxpayer failed to timely file a required federal-income-tax return. See Wheeler v. Commissioner, 127 T.C. 200, 207-208 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); Higbee v. Commissioner, 116 T.C. at 447. The IRS does not bear the burden of proof with regard to whether the "reasonable cause" exception of section 6651(a)(1) applies. See Higbee v. Commissioner, 116 T.C. at 447.

Evans's return for 2009 was due on April 15, 2010. See sec. 6072. He did not request an extension of time to file the return. Evans mailed his return to the IRS in April 2012, and the IRS received it on April 27, 2012. These facts are sufficient to satisfy the IRS's burden of producing evidence that imposing the

---

[26]The amount required to be shown as tax on the return (an amount that forms the basis of the sec.-6651(a)(1) addition to tax) is reduced by certain payments and credits, including the amount of wages withheld for federal income tax. Sec. 6651(b)(1); see sec. 31(a)(1). Thus, in its calculations in the notice of deficiency issued to Evans for 2009, the IRS reduced the amount required to be shown as tax on the return for 2009 by the amount of wages withheld for 2009.

**[\*43]** addition to tax under section 6651(a)(1) is appropriate for the 2009 tax year.
See, e.g., Wheeler v. Commissioner, 127 T.C. at 207-208.

Consequently, Evans is liable for the section-6651(a)(1) addition to tax for
the 2009 tax year unless he has produced evidence sufficient to persuade the Court
that he had reasonable cause for his failure to timely file his 2009 return and that
his failure to do so was not due to willful neglect. See Higbee v. Commissioner,
116 T.C. at 447.

Reasonable cause excusing a failure to timely file exists if the taxpayer
exercised ordinary business care and prudence but nevertheless was unable to file
the return by the deadline. See Crocker v. Commissioner, 92 T.C. 899, 913
(1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs. "Generally, factors that
constitute 'reasonable cause' include unavoidable postal delays, death or serious
illness of the taxpayer or a member of his immediate family, or reliance on the
mistaken legal opinion of a competent tax adviser, lawyer, or accountant that it
was not necessary to file a return." Marrin v. Commissioner, 147 F.3d 147, 152
(2d Cir. 1998), aff'g T.C. Memo. 1997-24. Evans contends that his failure to
timely file his 2009 return was due to reasonable cause and not due to willful
neglect because:  (1) it was the result of emotional distress he suffered following

**[\*44]** his daughter's death and (2) he did not believe he owed any tax for the 2009 tax year.

As to Evans's first argument--that his failure to timely file was the result of emotional distress he suffered following his daughter's death--Evans testified that, following her death, he had to receive counseling to cope with his suffering and that he lost motivation to fulfill basic personal commitments, including the filing of tax returns. After his daughter's death in 2007, Evans continued working full time (except for a brief interruption in 2011) for his employer, Athens Group, where he managed large-scale real-estate-development projects. He was working for Athens Group in April 2010, when the return in question was due. He was still working for Athens Group in April 2012, when he finally filed his return. His employment suggests that he was capable of meeting his tax filing obligations at the time his return was due. See, e.g., Tabbi v. Commissioner, T.C. Memo. 1995-463, 70 T.C.M. (CCH) 836, 849 (1995). Although we are sympathetic to Evans's suffering, the record does not demonstrate that Evans's distress was the cause for the filing delay. See also Stevens Bros. Found. v. Commissioner, 39 T.C. 93, 130 (1962) ("[A]n acceptable reason for failure to file a return will excuse such failure only so long as the reason remains valid."), aff'd in part, rev'd in part on another issue, 324 F.2d 633 (8th Cir. 1963). Compare Williams v. Commissioner, 16 T.C.

[*45] 893, 906 (1951) (no reasonable cause where taxpayer failed to show that physical incapacity resulting from stroke was ongoing when returns were due), and Peterson v. Commissioner, T.C. Memo. 2015-1, at *27-*28 (no reasonable cause where link between illness and death of taxpayer's parents and late filing was too tenuous), with Tabbi v. Commissioner, 70 T.C.M. (CCH) at 849 (reasonable cause existed where taxpayers were continuously attending to their dying son and filed their returns soon after his death).

We now turn to Evans's argument that his failure to file was the result of reasonable cause because he did not believe that there was any tax due for 2009. In general, a person must file a tax return if the person's gross income exceeds the sum of the personal-exemption deduction and the standard deduction for the given year. See sec. 6012. Evans had wage income of $388,333. This amount alone exceeds the sum of the personal-exemption deduction and the standard deduction for 2009.[27] Evans did not testify, nor does the record otherwise indicate, that he sought advice in determining whether he was required to file a return for 2009.

---

[27]Taking into account the personal exemption deduction and the standard deduction, an IRS publication for 2009 states that a single person under 65 filing as single must file an income-tax return if gross income is at least $9,350 and a married couple under 65 filing jointly must file an income-tax return if their gross income is at least $18,700. Pub. 501, Exemptions, Standard Deduction, and Filing Information, at 3. http://www.irs.gov/pub/irs-prior/p501--2009.pdf.

[*46] Evans testified that he "assumed" that "the losses * * * [he] experienced would more than offset any income that * * * [he] had from * * * [his] salaries and employment." In other words, even though Evans's gross income greatly exceeded the threshold for filing a tax return, Evans thought his taxable income was so low that he would not owe tax.[28] Evans's mistaken belief that he did not owe tax does not give us a basis for concluding that his failure to file a timely return was the result of reasonable cause and not due to willful neglect. See, e.g., Trask v. Commissioner, T.C. Memo. 2010-78, 99 T.C.M. (CCH) 1335, 1341 (2010); Marrin v. Commissioner, T.C. Memo. 1997-24, slip op. at 21 (citing Linseman v. Commissioner, 82 T.C. 514, 523 (1984)).

Accordingly, we hold that Evans is liable for the section-6651(a)(1) addition to tax for 2009.

b.    Section-6651(a)(2) addition to tax for failure to pay tax timely

The IRS also determined that Evans is liable for the section-6651(a)(2) addition to tax for 2009. Section 6651(a)(2) imposes an addition to tax for the failure to pay "the amount shown as tax on any return" required to be filed by the taxpayer by the payment due date unless the failure to pay is due to reasonable

---

[28]The income tax is an arithmetic function of taxable income. See sec. 1. Taxable income is gross income minus deductions. Sec. 63(a).

[*47] cause and not willful neglect.  If the amount shown as tax on the return is more than the correct tax, the correct tax is considered the "amount shown as tax" on the return.  Sec. 6651(c)(2).  A taxpayer's "return" includes either a return filed by the taxpayer or a substitute for return prepared by the IRS under section 6020(b).  See sec. 6651(a)(2), (g)(2); Cabirac v. Commissioner, 120 T.C. 163, 170 (2003).  The amount of the addition to tax is 0.5% of the amount shown as tax on the return but not paid and an additional 0.5% for each month, or fraction thereof, during which the failure to pay continues, up to a maximum of 25%.  Sec. 6651(a)(2), (b)(2).  The amount of the addition to tax under section 6651(a)(2) reduces the addition to tax under section 6651(a)(1) for any month for which both additions to tax apply.  See sec. 6651(c)(1).

The IRS satisfies its burden of production under section 7491(c) for the section-6651(a)(2) addition to tax by producing evidence sufficient to establish that a return showing the taxpayer's tax liability was filed by the taxpayer or prepared by the IRS as a substitute for return under section 6020(b) for the year in question.  Wheeler v. Commissioner, 127 T.C. at 210.  The IRS does not bear the burden of proof for the "reasonable cause" exception to the section-6651(a)(2) addition to tax.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 447.

[*48] Evans's 2009 tax return and payment were due on April 15, 2010.[29] See sec. 6072. Evans did not file a return on or before this due date and did not request an extension of time to file the return. On April 9, 2012, the IRS prepared a Form 4549, "Income Tax Examination Changes", and accompanying documents. These documents reflected that: (1) Evans owed $372,457 in federal income tax for 2009; (2) Evans had made payments (through withholding) of only $2,920; and (3) after withholding, Evans had a balance of $369,537 for unpaid tax. Included among the documents prepared by the IRS was a Form 13496, "IRC Section 6020(b) Certification", for Evans's 2009 tax year.[30] A document or set of documents signed by an authorized IRS official or employee is a return for purposes of section 6020(b) if the document(s): (1) identify the taxpayer by name and taxpayer-identification number, (2) contain sufficient information to compute the taxpayer's tax liability, and (3) purport to be a return. Sec. 301.6020-1(b)(2), Proced. & Admin. Regs. The Forms 4549 and 13469 and the accompanying

---

[29]Unless extended, see sec. 6161(a), the due date of a tax payment is generally the date on which the return is required to be filed, sec. 6151(a). Evans did not receive an extension of time to pay the tax. Evans's tax payment for the 2009 tax year was due on April 15, 2010. See sec. 6151.

[30]A Form 13496 is a certification, which is signed by an IRS officer, that the documents attached thereto constitute a return under sec. 6020. See sec. 301.6020-1(b)(2), Proced. & Admin. Regs.

**[*49]** documents satisfy the above requirements and qualify as a substitute for return under section 6020(b).[31]  Consequently, they count as a return for purposes of section 6651(a)(2).  <u>See</u> sec. 6651(g)(2); <u>Reyes v. Commissioner</u>, T.C. Memo. 2012-129, 103 T.C.M. (CCH) 1716, 1718 (2012).  We also observe that, later in April 2012, the Evanses filed a Form 1040 for the tax year 2009, reporting a tax liability of $75,720.  There was both a return filed by the taxpayer and a substitute for return prepared by the IRS.  Therefore, the IRS has satisfied its burden of production under section 7491(c).  <u>See</u> <u>Wheeler v. Commissioner</u>, 127 T.C. at 210 (IRS must show either that taxpayer filed return or IRS prepared substitute for return).  Consequently, Evans is liable for the section-6651(a)(2) addition to tax for 2009 unless the evidence persuades the Court that he had reasonable cause for his failure to pay timely the "amount shown as tax" on the "return".[32]  <u>See</u> sec.

---

[31]We reject Evans's argument that the April 9, 2012 documents constituted a request for a return, rather than a substitute for return.

[32]Mathematically, the amount of the sec. 6651(a)(2) addition to tax is a function of the "amount shown as tax" on the "return".  Evans failed to file a timely return; the IRS made a substitute for return showing a tax liability of $369,537; only after the substitute for return was made did Evans mail the IRS a Form 1040 showing a tax liability of $75,720; the notice of deficiency computed the sec. 6651(a)(2) addition to tax on the $369,537 shown on the substitute for return (<u>see</u> sec. 6651(g)(2) (providing that a substitute for return is treated as the return filed by the taxpayer for purposes of determining the amount of the section 6651(a)(2) addition to tax)), not the $75,720 shown on Evans' Form 1040; the

(continued...)

[*50] 6651(a)(2); <u>Higbee v. Commissioner</u>, 116 T.C. at 447 (taxpayer bears the burden of proving reasonable cause).

Reasonable cause excusing a failure to pay timely exists if the taxpayer exercised ordinary business care and prudence in providing for payment of the tax liability and was nevertheless either unable to pay the tax or would have suffered an undue hardship if he or she had paid the tax on the due date. <u>Downing v. Commissioner</u>, 118 T.C. 22, 28 (2002); sec. 301.6651-1(c)(1), Proced. & Admin. Regs. An "undue hardship" means more than an inconvenience; rather, an "undue hardship" would exist if the taxpayer would suffer a substantial financial loss if he or she had to make the tax payment on its due date. <u>Downing v. Commissioner</u>,

---

<sup>32</sup>(...continued)
notice of deficiency did not determine that Evan's filing of the Form 1040 triggered the section 6662 penalty; and Evans has never expressly challenged the assumption in the notice of deficiency that the "amount shown as tax" on the "return" is the $369,537 shown as tax on the substitute for return. Under these circumstances, the "amount shown as tax" on the "return" is the $369,537 shown as tax on the substitute for return. However, the $369,537 may be replaced under sec. 6651(g)(2), which provides that the correct tax replaces the "amount shown as tax" on the "return" if the correct tax is less than the "amount shown as tax" on the "return". See <u>Palmer v. Commissioner</u>, T.C. Memo. 2015-30 at *18-*19 (when the correct amount of tax is less than the amount shown on the substitute for return, the correct amount of tax instead of the actual amount shown as tax on the substitute for return is used to calculate the sec. 6651(a)(2) addition to tax amount). The correct amount of tax will be determined by the Court after the parties submit Rule 155 computations reflecting the concessions of the parties and the holdings in this opinion.

[*51] 118 T.C. at 29. Evans has not persuaded us that he was unable to pay the tax or that he would have suffered an undue hardship if he had paid the tax on the due date. Thus, Evans has not shown that his failure to timely pay the "amount shown as tax on the return" for 2009 was due to reasonable cause and not due to willful neglect. Accordingly, we hold that Evans is liable for the section-6651(a)(2) addition to tax for 2009.

    c.    <u>Section-6654(a) addition to tax for failure to pay estimated tax</u>

The IRS also determined that Evans is liable for a section-6654(a) addition to tax of $8,840 for 2009. Section 6654(a) imposes an addition to tax on an individual taxpayer who underpays at least one of four required installments of estimated tax. Sec. 6654(a), (b), and (c). Each required installment is equal to 25% of the "required annual payment". Sec. 6654(d)(1)(A). The required annual payment is equal to the lesser of two amounts: (1) 90% of the tax shown on the individual's return for the tax year (or, if no return is filed, 90% of the correct tax for such year) or (2) if the individual filed a return for the immediately preceding tax year, 100% of the tax shown on that return. Sec. 6654(d)(1)(B). If the individual did not file a return for the preceding tax year, then the required annual payment is equal to amount (1). See sec. 6654(d)(1)(B)(i), (B) (flush language). A return filed after the notice of deficiency has been issued does not qualify as a

[*52] return for determining the required annual payment. Mendes v. Commissioner, 121 T.C. 308, 324 (2003). A substitute for return filed by the IRS does not qualify as a return for determining the required annual payment. See Duma v. Commissioner, T.C. Memo. 2009-304, 98 T.C.M. (CCH) 661, 665 n.6 (2009).

To satisfy its burden of production under section 7491(c) for the section-6654(a) addition to tax, the IRS must produce evidence establishing that the taxpayer had a "required annual payment" as defined in section 6654(d)(1)(B). Wheeler v. Commissioner, 127 T.C. at 211-212. This burden requires the IRS to produce evidence that allows the Court to determine the amount of the required annual payment. See sec. 6654(d)(1)(B)(i) and (ii); Wheeler v. Commissioner, 127 T.C. at 212. To determine the amount of Evans's required annual payment for 2009, we must know whether Evans filed a return for the preceding taxable year (2008) and, if so, the amount of the "tax shown" on that return. See sec. 6654(d)(1)(B)(ii). Thus, the IRS must introduce evidence showing whether Evans filed a return for 2008 and, if so, the amount of "tax shown" on that return. See id.

In this case, the IRS has not met its burden of production. A party bearing the burden of production is normally expected to propose relevant findings of fact in its brief. Tax Ct. R. Prac. & Proc. 151(e)(1). The IRS's opening brief contains

[*53] no findings of fact concerning whether Evans filed a return for 2008, and if so, the amount of tax shown on his return. Furthermore, the only evidence the IRS introduced regarding the filing of a 2008 return was a transcript of account for tax year 2008. We have reviewed the transcript. We find it inscrutable as to whether a 2008 return was filed and whether the IRS issued a notice of deficiency for 2008.[33] If we were left only with the transcript of account to determine whether Evans filed a 2008 return, we would conclude that there is insufficient evidence to satisfy the IRS's burden of production. And, as we explain below, none of the evidence Evans submitted leads to the conclusion that there was a required annual payment.

Evans testified that he filed his 2008 return in 2012. He introduced a copy of the return into evidence, and we admitted it.[34] On the basis of the credibility of

---

[33]At trial the Court questioned the IRS attorney about the meaning of an entry in the transcript of account that seemingly suggested that Evans filed a 2008 return in 2012. The attorney conceded that the entry could refer to a return filed by Evans or a substitute for return filed by the IRS. A substitute for return does not count as a "return" for sec.-6654 estimated-tax purposes.

[34]In its posttrial brief the IRS contends that the Court reserved ruling on the admissibility of Evans's 2008 return. But, as reflected in the transcript, what actually happened was: (1) Evans offered the 2008 return into evidence, (2) the IRS objected to the return on the grounds that (a) it had not been exchanged before trial, (b) it was inauthentic, and (c) it was inaccurate; (3) the Court admitted the 2008 return but told the IRS it could still dispute the accuracy of the return. This

(continued...)

[*54] Evans's testimony, the copy of the return in evidence, and our review of the IRS's transcript of account, we found that Evans mailed his return to the IRS in 2012. The question of whether the 2008 return Evans mailed qualifies as a return for these purposes depends on whether he mailed it before the IRS issued a notice of deficiency for the 2008 tax year. See Mendes v. Commissioner, 121 T.C. at 324. If he mailed the return before the notice of deficiency was issued, the return is considered a return for purposes of the required annual payment. See id. We hold that the 2008 return was mailed before any notice of deficiency was issued. The only potential source of information in the record about the issuance of a notice of deficiency for 2008 is the IRS's transcript of account for that year. However, as noted before, we cannot tell from the transcript of account when, if ever, a notice of deficiency for 2008 was issued. The lack of evidence works against the IRS because the IRS has the burden of production. It failed to show that it issued the notice of deficiency before Evans mailed his 2008 return. We therefore conclude that the 2008 return Evans mailed qualifies as a return for

[34](...continued)
ruling is consistent with the general principle that parties can challenge the "accuracy", or correctness, of evidence even though the Court has admitted the evidence. See, e.g., Hatch v. Commissioner, T.C. Memo. 1980-110, 40 T.C.M. (CCH) 110, 125 (1980). Thus, the Court has already ruled that Evans's 2008 return is admissible.

[*55] purposes of section 6654. The 2008 return shows on its face a tax liability of zero. Because the return qualifies as a return for computing the required annual payment, amount (2) is zero and the lesser of amount (1) and amount (2) is zero. See supra pp. 51-52. This means that the required annual payment for 2009 is zero.

On this record, there is no required annual payment for 2009. Therefore, Evans is not liable for the section 6654(a) addition to tax.

In reaching our holdings, we have considered all arguments made by the parties, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.